| 38 | 459 |
| 67 | 36 |
| 38 | 459 |
| 69 | 33 |
| 69 | 381 |
| 69 | 383 |
| 38 | 459 |
| 70 | 484 |
| 38 | 459 |
| 74 | 540 |

THE ATTORNEY-GENERAL, at the relation of ABBOT & a., *v.* THE TOWN OF DUBLIN & a.

A bequest was made in 1817 by the minister of the Congregational church and society in Dublin, to the town, in trust for the support of the Christian religion in that society; the interest to be paid quarterly, forever, to the minister of the Congregational persuasion who should be regularly ordained and stately preach in that society.—*Held,* as follows:

The term "Congregational persuasion," in the will, has the same meaning as the term Congregational denomination.

The terms Congregational persuasion and Congregational denomination are used in their appropriate sense to signify the Congregational polity, and are not the proper and appropriate terms to designate any creed, or to define any system of doctrines.

Courts will resort to the original and long continued application of a religious charity by the trustees for aid in giving a construction to doubtful terms in the instrument which established the charity.

The individual religious opinions of the donor cannot be received to enlarge or contract the meaning of general terms used in the instrument by which he established the charity.

Where the original trustees appointed by the founder of a religious charity applied the fund to the support of certain religious doctrines, and that application has been long continued and acquiesced in, a court of equity will not interfere with the application, on the ground that the founder intended to limit the benefit of his charity to the support of different doctrines, unless that intention was plainly expressed by the donor.

The general meaning of the term, "minister of the Congregational persuasion," must be determined by the court as matter of law; and the testimony of witnesses to their opinions, derived from the study of books, cannot be received to prove the meaning of the term.

The term, "minister of the Congregational persuasion," has not now, and had not in 1817, any local meaning, peculiar to New-Hampshire; nor any peculiar and conventional sense in the usage of any religious sect or party.

Since 1817 there has been no change in the meaning of that term, or in the opinions and condition of the Congregational denomination, that can affect the construction of this will.

The term, "minister of the Congregational persuasion," as used in this will, is broad enough to include a Unitarian minister, who believes in the Father, Son and Holy Ghost, one in purpose and design but not the

same in substance, equal in power and glory; in the divinity of Jesus Christ in the sense that he is a divine person, but not in his supreme divinity in any sense in which he can understand the terms; in the resurrection of Jesus Christ from the dead; in the atonement in the sense of reconciliation by Jesus Christ, but not in the vicarious atonement; in the personality of the Holy Ghost; in regeneration by the Holy Spirit, but not in a supernatural regeneration; that the Scriptures contain a divine revelation, given by inspiration of God, and a perfect and the only rule of faith and practice, but in no other sense in the full inspiration of the Scriptures; in the future but not in the eternal punishment of the wicked; in the depravity of men, but not in the total depravity of the entire race; nor in the doctrines of election, predestination, the perseverance of the saints, and justification, as they are set forth in the Assembly's Catechism.

Unitarians, holding such opinions, are to be regarded, in the law of this State, and within the meaning of the term as used in this will, as one of the sects of the Christian religion.

There is no positive rule, nor any settled practice, in the Congregational denomination, which, under all circumstances, makes it necessary to regular ordination that the ordaining council should be called from neighboring churches.

Where, previous to the statute of 1819, authorizing individuals to form themselves into religious societies, a fund was given for the benefit of a voluntary religious society, connected with an organized church, and the members of the society afterwards adopt the provisions of that act, and continue their association in connection with the same church, so that the society associated under the statute is composed substantially of the same members as before, the society, thus associated under the statute, will be entitled to the benefit of the fund.

Seceders from a religious society are not entitled to share in the benefits of a fund held in trust for the society.

Towns in this State may legally hold funds in trust for the support of religion within their limits.

THIS was an Information, filed by the Attorney-General, at the relation of the Trinitarian Congregational Society in Dublin, and the Reverend Edward F. Abbot, and a Bill in Equity, prosecuted by the said Trinitarian Congregational Society and the said Abbot against The Town of Dublin, The First Congregational Society in Dublin, the Reverend Levi W. Leonard, and the Reverend William F. Bridge. The bill was filed December, 1855,

and amended by making the Attorney-General a party, October 15, 1856. The bill and information stated the following facts:

The town of Dublin, on the 6th of August, 1777, made choice of the Reverend Edward Sprague as their gospel minister, and on the 25th of October, in the same year, Mr. Sprague accepted the charge by a letter, which is set out in the bill. The Congregational Church of the town also gave him a call, and on the 12th of November, 1777, he was ordained to the work of the gospel ministry, and the pastoral care of the church, according to Congregational usage; and that relation continued till December 16, 1817, when he died.

On the 13th of December, 1817, Mr. Sprague made his will, by which he gave to the town of Dublin five thousand dollars, "to be kept at interest by said town forever, for the sole purpose of supporting the Christian religion in the Congregational Society, so called, in said town; the interest thereof to be paid quarter-yearly to the minister of the Congregational persuasion who shall be regularly ordained and statedly preach in said Society." The town of Dublin was residuary legatee. The will was duly proved, and on the 5th of June, 1820, the five thousand dollars were paid to the town.

In the winter of 1819–1820 Samuel Twitchell and others, inhabitants of Dublin, a part or all of whom had been members of the church or congregation to which Mr. Sprague in his life time ministered, associated themselves into a society for moral and religious purposes, under the name of the First Congregational Society in Dublin, and that society, in connection with the church of which Mr. Sprague had been the pastor, afterward extended a call to Mr. Leonard, the defendant, and thereupon a council of ministers and delegates was convened at Dublin, by the major part of whom Mr. Leonard was, on the 6th of September, 1820, ordained as the pastor and christian teacher of said church

and society, and has remained in that relation till the present time. On the 13th of June, 1855, the defendant, William F. Bridge, was installed as colleague of Mr. Leonard by a council of Unitarian ministers and delegates. From the settlement of Mr. Leonard till the filing of the bill the town has, directly or indirectly, paid the interest of the five thousand dollars to Mr. Leonard or Mr. Bridge.

In September, 1827, Stephen J. Woods, Abijah Richardson, Thomas Hay, Luke Richardson, Martha Woods, Lucy Hardy, Rebekah Hay and Elizabeth Richardson, inhabitants of said town, and residing within and members of what is termed in said will the "Congregational Society" in said town, some of whom had been members of said church while said Sprague was its pastor, and all of whom had been members of his congregation, being dissatisfied with the doctrinal opinions of Mr. Leonard upon fundamental points, withdrew from the church and congregation to which he ministered, and on the 21st of November, 1827, were regularly organized into a Congregational church, and about the same time the said Woods and others formed themselves into a religious association, for the support of the christian religion in said town, in connection with the last mentioned church; in 1836 built a meeting-house, and in April, 1837, organized under the act of 1827, and assumed corporate powers by the name of the "Trinitarian Congregational Society in Dublin."

The members of this last named society reside in Dublin, within the limits of the Congregational Society mentioned in the will, and the church is of the Congregational persuasion, in the sense in which those words were used in the will, and in which they were commonly used when the will was made and took effect; holding to the form of church government and ecclesiastical polity and to the doctrinal opinions commonly held by churches and ministers of the Congregational persuasion at that time. On the 12th of December, 1855, the complainant, Edward

F. Abbot, being a minister of the Congregational persua-
sion in the sense aforesaid, was regularly ordained as the
pastor and religious teacher of the said Trinitarian Con-
gregational Church and Society, and now statedly preaches
in the meeting-house erected by that society.

Mr. Leonard and Mr. Bridge are not regularly ordained
ministers of the Congregational persuasion, in the sense
of the terms as used in the will, and in which they were
generally used and understood when the will was made
and took effect, but, on the contrary, are ministers of the
Unitarian persuasion, and differ widely and radically from
most or all persons of the Congregational persuasion,
upon certain fundamental doctrines, which were held by
Mr. Sprague, and which were commonly held, at the time
the will was executed, by members of the Congregational
persuasion, and which doctrines are in substance those
contained in the "Assembly's Catechism," so called, taken
as a whole, and in particular the doctrine of the Holy
Trinity, of native total depravity, of vicarious atonement
by Jesus Christ, of a supernatural regeneration by the
Holy Ghost, of the eternal punishment of the wicked,
and of the full inspiration and binding authority of the
Holy Scriptures ; some or all of which are rejected by
Mr. Leonard and Mr. Bridge, and by the church and soci-
ety with which they are connected.

The council by which Mr. Leonard was ordained was
mostly composed of Unitarians ; and the pastor of the
Congregational church in Keene, the Rev. Dr. Barstow,
and the delegate from that church, who were originally
members of the council, dissented from the settlement of
Mr. Leonard on the ground that he was a decided Unita-
rian, and refused to take any part in his ordination.   The
council by which Mr. Bridge was installed was wholly
composed of ministers and delegates from churches of the
Unitarian persuasion, having no ecclesiastical connection
and not in fellowship with the Cheshire Conference, of

Congregational churches, within the limits of which the town of Dublin is situated, or with Trinitarian churches, or with churches of the Congregational persuasion, as intended by said will, and Mr. Bridge has never been regularly ordained by any council of that persuasion.

The Trinitarian Church and Society, since they were organized, in 1837, have supported the christian religion and the preaching of the gospel by regularly ordained ministers of the Congregational persuasion; but the society is feeble and poor, and has needed and still needs the interest of the five thousand dollars for the proper support of such preachers as Mr. Abbot; but the town has refused and still refuses to appropriate such interest, or any part of it, for the support of regularly ordained ministers of the Congregational persuasion, employed by and for the Trinitarian society.

The Congregational Society in Dublin, mentioned in the will, was not a corporation, but the term was used indefinitely in the will, for such inhabitants of said town as should from time to time adhere to the doctrines and practices of the Congregational persuasion, and the congregation worshipping with them; and the church and society to whose aid the income of the fund has been applied, are not, and for many years have not been a church and society of that persuasion, as the same was commonly known at the time said will took effect, and as intended in said will, by reason of their rejection of the doctrine of the Holy Trinity, and other essential doctrines of the Congregational persuasion.

The bill and information prayed for an account, for a declaration that ministers of what are commonly called the Unitarian persuasion are not fit objects of the trust; that the town may be enjoined not to apply the income of the fund to the support of any such minister, or of Mr. Leonard or Mr. Bridge, or for the benefit of the First Congregational Society; and may be ordered to pay it for the

support of the complainant Abbot, and the benefit of the Trinitarian Society, and for the support of the christian religion and the preaching of the gospel by Trinitarian ministers of the Congregational persuasion; and for general relief.

Answers were filed in October, 1856, which were excepted to. The defendants submitted to the exceptions, and filed further answers, in March, 1857. The answers all admitted the following facts, as stated in the bill and information, to wit: that Mr. Sprague was the Congregational minister of the Congregational society in Dublin from November 12, 1777, to December 16, 1817, when he died; that he made the bequest to the town of Dublin which is stated in the bill and information; that Stephen J. Woods and others seceded from the First Congregational Society in September, 1827.

The answers alleged that in the winter of 1819–1820 Samuel Twitchell and others, inhabitants of Dublin, all or part of whom had been members of the church or congregation to which Mr. Sprague had ministered, associated themselves into a religious society, under the name of the First Congregational Society in Dublin, and under the statute of 1819; that this association, under the statute, had become necessary, because, after the passage of that statute, towns could no longer contract with or raise money for the support of ministers:

That the First Congregational Society, in connection with the church of which Mr. Sprague had been pastor, regularly called and settled the defendant, Mr. Leonard, who was regularly ordained as the pastor and Christian teacher of that church and society, according to the forms of the Congregational persuasion, on the 6th of September, 1820, and the defendant, Mr. Bridge, was in like manner installed as colleague in 1855; that Mr. Leonard statedly preached in that society till the installation of Mr. Bridge, and Mr. Bridge from that time forward:

That the First Congregational Society is the society meant by the will; that Mr. Leonard and Mr. Bridge are and have been regularly ordained ministers of the Congregational persuasion, within the meaning of the will. They deny that Mr. Leonard or Mr. Bridge has taught or held any religious opinions not held by Congregationalists; they deny that Mr. Sprague held and taught all the doctrines of the Westminster Catechism; and say they are informed and believe that he rejected several of the distinctive doctrines of that catechism, and was, at least in the later years of his life, a liberal, or Unitarian Christian. The defendant, Mr. Bridge, in his answers, gives an account of his religious opinions, which is stated in the opinion of the court.

Upon the question, what doctrines are held by the First Congregational Church and Society, the answers say that the defendants believe they are generally and substantially those held by Mr. Leonard and Mr. Bridge, and also say that there is extant a church covenant, which they have been informed and believe is a true copy of the original church covenant, drawn up in the handwriting of Mr. Sprague, and subscribed or assented to by all the individuals who were admitted to the church in his lifetime, and after it was drawn up. This covenant is set out in the answers, as follows:

"We, whose names are hereunto subscribed, apprehending ourselves called of God unto a sacred fellowship with one another in the profession and practice of the holy Christian religion as a particular church of the Lord Jesus, do solemnly covenant with God and with one another, as follows:

"In the first place, we avouch the Lord this day to be our God, yielding ourselves to him to be his servants, and choosing him to be our portion forever. We give up ourselves unto the God whose name alone is Jehovah, to be

The Dublin Case.

his people, to walk in his ways, and to keep his command-
ments, and his statutes, and his judgments, and to hearken
unto his voice, declaring our firm assent unto the truths
and hearty consent unto the terms of the gospel.

" We accept of Jesus Christ in all his glorious offices,
prophetical, priestly and kingly, and depend on him in
the way which he hath prescribed, for instruction, pardon
and eternal life.

" We profess our serious resolution to deny, as the grace
of God teaches us, all ungodliness and worldly lusts, and
to live soberly, righteously and godly in this present world;
to endeavor that our conversation may be such as becomes
and adorns the gospel.

" We promise, by the help of God's grace, to walk
together in all the ways of holy communion, as brethren
in the family of Christ, and children of our Father who
is in heaven; to keep the faith and observe the order of
the gospel; cheerfully to support and conscientiously to
attend the public worship of God in all the instituted
duties thereof, and be submissive to the discipline of his
kingdom; to watch over one another with Christian cir-
cumspection, and endeavor our mutual edification in holi-
ness and comfort.

" Furthermore, we dedicate our offspring, with ourselves,
unto the Lord, engaging to bring them up in his nurture
and admonition, and, as far as in us lies, to transmit the
ordinances of God, pure and entire, unto them.

" All this we do in the presence and fear of God, with
a deep sense of our unworthiness to be admitted into cov-
enant with him, and to enjoy the privileges of the church
evangelical, and our insufficiency to perform the duties of
it, without his gracious assistance, and do therefore rely
on and pray to the God of grace, who brought again from
the dead our Lord Jesus Christ, that great shepherd of
the sheep, that through the blood of the everlasting cove-
nant he would make us perfect in every good work to do

his will, working in us that which is well pleasing in his sight, through Jesus Christ, to whom be glory forever and ever.   Amen."

The answers also say there is now in use a church covenant drawn up by Mr. Leonard, and designed by him to embrace, in a more comprehensive form, the substance of the before-mentioned covenant, of which the following is a copy :

"Apprehending it to be your duty to make a public profession of the holy christian religion, and being desirous to unite yourself with the church of Christ in this place you (each of you) do this day avouch the Lord to be your God, yielding yourself (selves) up to him, to be his servant (servants) and choosing him to be your portion forever.   You give yourself (selves) unto the God whose name alone is Jehovah, to walk in his ways, to keep his commandments, and to hearken unto his voice, declaring your firm assent unto the truths and hearty consent unto the terms of the gospel.

"You accept of Jesus Christ in all his glorious offices, prophetical, priestly and kingly, and depend on him in the way which he hath prescribed for instruction, pardon and eternal life.

"You profess your serious resolution to deny, as the grace of God teaches, all ungodliness and worldly lusts ; to live soberly, righteously and godly in this present world, and to endeavor that your conversation may be such as becomes and adorns the gospel.

"You promise, by the help of God's grace, to walk in all the ways of holy communion as joint heir (heirs) in the family of Christ, and children of our Father who is in Heaven ; to keep the faith and observe the order of the gospel, cheerfully to support and conscientiously to attend

the public worship of God in all the instituted duties thereof, and to submit to the discipline of his kingdom.

" All this you do in the presence and fear of God, with a deep sense of your unworthiness to be admitted into covenant with him, and to enjoy the privileges of the church evangelical, and of your own insufficiency to perform the duties of it without his gracious assistance; and you rely on and pray to the God of grace, who brought again from the dead our Lord Jesus Christ, the great shepherd of the sheep, that through the blood of the everlasting covenant he would make you perfect in every good work to do his will, working in you that which is well pleasing in his sight, through Jesus Christ.

" Now, therefore, in the presence of God, whose eye is over all, and in the name of Jesus Christ, his well beloved son, I declare you to be a member (members) of this church, in full communion; and we on our part, as members of the same church, in humble reliance on the divine assistance, promise to conduct toward you as becomes christians; and we pray that through the grace of God you may be enabled so to pass through this life as to obtain everlasting happiness in the life to come."

The answers say that the last mentioned covenant has been slightly varied by Mr. Bridge, and they set out the variations, which appear to be trifling, and merely verbal.

Mr. Leonard's answers show his opinions to be in general agreement with those of Mr. Bridge.

There was no evidence, except the answers, to show the religious opinions of Mr. Leonard and Mr. Bridge, but a great amount of evidence was taken to show the religious opinions of Mr. Sprague, consisting of the testimony of witnesses to his religious instructions and private conversations, and some manuscripts were produced on the part of the complainants, as copies of his sermons. These manuscripts were difficult to read. There was no evidence to show when they were preached, nor any direct evidence

that they were ever preached at all. There was also the evidence of witnesses who testified to their opinions derived from their studies and investigations of the subject, as to the meaning of the terms, " Congregational persuasion," and the doctrines and practices of the Congregational denomination. There was much contradiction in the evidence relating to the opinions of Mr. Sprague.

*C. R. Morrison*, for the complainants.

1. Since the town has not now any authority to raise money for the support of the ministry, and has, therefore, no interest in the matter, there should be a new trustee. The trustee cannot hold where he has no interest in the trust. In such case the fund is not lost, but the court appoint a trustee, to see that the trust is properly executed. 1 Paige Ch. 214 ; A. & A. on Cor. 128, 130.

2. Trinitarians may be fit objects of the trust ; they are as much inhabitants of Dublin as Unitarians, and even admitting that Unitarians are not excluded, Trinitarians are entitled as well as others. There is no society qualified under the terms of the will. Neither of the societies constitute the whole of Mr. Sprague's congregation ; it takes both societies to do that. The difference in religious opinion was fundamental, and required the secession. The case of the devise to the Jews' Poor at Mile End is in point. In that case there were two institutions, and the court ordered the fund to be divided. The court should appoint a new trustee. *Bennet* v. *Hoyten*, 2 Beavan 81 ; Story on Equity, secs. 1169, 1170 ; 2 Vesey, Jr., 380 ; 15 Vesey 232 ; 3 Pet. 99.

3. We maintain, however, that Unitarianism is a ground of exclusion, and that the fund has been wholly misapplied, and this is the great question in the case. Its determination must depend upon the construction to be given to that part of the will which requires that the fund shall be

" for the sole purpose of supporting the Christian religion in the Congregational society, so called, in said town, the interest thereof to be paid quarter-yearly to the minister of the Congregational persuasion who shall be regularly ordained and statedly preach in said society." The important terms are, "Christian religion," "Congregational persuasion," and "regularly ordained."

The terms used in the will must be interpreted in reference to the known opinions of the denomination to which Mr. Sprague belonged: First, because in this way we shall best ascertain their popular meaning; and second, because, if the sense in which they were used by the denomination was peculiar, they will be held to have been used in that sense. 1 Greenl. Ev., sec. 295. They are terms relating to religious and doctrinal opinions, and are to be construed according to the known opinions of the denomination.

It is not our position that, to take the benefit of this fund, the minister must hold to all the doctrines of the Catechism, but he must hold to the fundamental doctrines as they have been held by the great body of the denomination. One who rejects doctrines which, by the great body of the denomination, have been held to be fundamental, and essential to communion, cannot be intended.

The defendants, Leonard and Bridge, reject the following doctrines: The full inspiration of the Scriptures. To say that the Scriptures *contain* a divine revelation is quite different from full inspiration of the Scriptures: The doctrine of the Trinity; of vicarious atonement by Jesus Christ; of justification by faith; of the native total depravity of men; of supernatural regeneration by the Holy Ghost; of the eternal punishment of the wicked; of the saints' perseverance; of election; of predestination.

It is certain that Unitarianism is not the Christian religion, as always understood in the denomination. The phrase must be construed in accordance with that under-

standing, and in agreement with the common faith in its essential doctrines ; and construed by that rule it is clear that the fund cannot properly be applied to the support of Unitarianism. *Attorney-General* v. *Pearsons*, 3 Meriv. 353, 7 Sim. 290 ; *Attorney-General* v. *Shore*, 7 Sim. 309 and 11 Sim. 592–631 ; *Attorney-General* v. *Drummond*, 1 *Drury & Warren*, 353, 2 L. & Eq. R. 15 ; *Kniskern* v. *The Lutheran Churches of St. John and St. Peter*, 1 Sandf. Ch. 440 ; *Opinion of Gardner, Pres't*, in *Miller* v. *Gable*, 2 Denio 492, 7 Paige Ch. 211 ; *Field* v. *Field*, 9 Wend. 401, 10 Paige Ch. 492.

The doctrine of the Trinity has always been regarded by the great body of the denomination as an essential part of the christian religion ; and " if we take a part of christianity, and leave out a part that is essential to it, what we take is not christianity, because something that is of the essence is wanting." 3 Jona. Edwards' Works 108 ; Robinson's Catechism, 3 Works, 428 ; Emmons' Sermons, 11, pp. 190, 191 and 192 ; 2 Dwight's Theology, 43. The elder Edwards speaks of Arians and Socinians as heretics, and as denying fundamental doctrines of the christian religion ; 1 Works, 454, 457 ; and in relation to the vicarious atonement, he says it is of the essence of christianity. Ibid. 156, 157.

John Robinson denies that Arians can be a true church. 2 Works, 337, 338 and 285 ; 3 Ibid. 8, 9. Hopkins insists in strong language that Arians have no better claim to be called christians than Mohammedans. 3 Hopkins' Works, 312, 314 ; see, also, 1 Bellamy's Works 218 ; Smalley's Sermons, Ed. of 1803, pp. 315, 329, 330, 337 ; Address of the General Association of New-Hampshire upon the doctrine of the Trinity, issued in 1811.

The question is, not whether Unitarians or Trinitarians are right in their belief, but whether, according to the common understanding of the Congregational denomination, Unitarians could belong to the christian religion.

The Dublin Case.

The defendants, Leonard and Bridge, are not ministers of the Congregational persuasion, on account of the religious doctrines which they hold.

In the first place we say that in 1817 there was a well known denomination of christians called, from one of their principles, Congregationalists, Congregational denomination, or Congregational persuasion, and that such terms, as commonly used, always included doctrine as well as polity. In the second place, that this denomination from the beginning held to certain doctrines, and in particular to that of the Trinity, as fundamental articles of faith, and as an essential part of the christian religion; and in the third place, that, with the exception of about one third only of the Massachusetts churches, the great body of the Congregational churches have ever since adhered to those fundamental articles, and have excluded all who rejected them from their communion and fellowship.

There was a common faith in the Congregational churches. 3 John Robinson's Works, 8, 9, 64; Felt's Ecclesiastical History, 279, 381, 5, 46, 58, 106, 115, 116, 117, 129, 133, 137, 239, 242, 265, 367, 391, 421, 547, 551, 602; Vote of the Synod, in 1648; 2 Winthrop's History, 331; 2 Mather's Magnalia, 155; Congregational Manual, 47; Hubbard's History, 537, 540; The Savoy Confession; 4 Neal's History of the Puritans, 215; Confession of Faith of 1680, and Preface; Congregational Manual, 89; Heads of Agreement between the Congregationalists and Presbyterians in 1690, arts. 2 and 3; Upham's Ratio Disciplinæ, 35, 304, 310, 311; Saybrook Articles of Agreement; Cotton Mather's Ratio Disciplinæ, 1726, pp. 3, 4, 5 and 7; Cyclopædia of Religious Knowledge, article Congregationalists; Answers of the New-England Elders in the year 1639, Questions, 8, 9; Doctrine of the Church, by John Cotton, 1639; The Sermon of the Twelve Articles, by John Cotton, 1640; Defence, &c., by Allen and Shepard, 1645; Edward Winslow's

Letter to Winthrop, 1645; Hooker's Church Discipline, 1, 2, 15, 16, of the Preface; Cambridge Platform, 1648, C. ii.; C. iii., secs. 1, 2; C. xiv., sec. 2; C. xv., sec. 2; C. xvi., secs. 4, 5; C. xvii., sec. 8; The Orthodox Evangelist, by John Norton, Teacher of the Church at Ipswich, 1654, pp. 32, 33; Higginson's Election Sermon, 1663; vol. I. Belknap's History, note to page 88; The Divine Institution of Congregational Churches, by Isaac Chauncey, A. M., 1697, C. iv., secs. 3, 10; C. xii., secs. 10, 11, 12; The Order of the Gospel, by Increase Mather, 1700, pp. 19, 187; Act of 10th Will. 3, c. 32, which makes denial of the Trinity to be blasphemy; Extract from the Sermon of Samuel Mather, 2 L. & Eq. 25; Evelyn's History and Narrative, cited 2 L. & Eq. 25; Opinion of the Chancellor in Attorney-General *v.* Drummond, 1 Drury and Warren 353; Case of the Rev. John Rogers, of Leominster, in 1650; American Unitarianism, by Thomas Belsham, 2d ed., 1815; Third Letter by Dr. Worcester to Dr. Channing, December, 1815, pp. 69, 72, 76, 78, 79; N. H. Annual Register, from 1816 to 1830; Half Century of Unitarianism, by Dr. Ellis, pp. 28, 29, 31, 34, 189, 190, 226; Authorities collected in a pamphlet, entitled, "Did the First Church of Salem originally have a Confession of Faith? by J. B. Felt."

It is true that the votes of the Synods of 1648 and 1680, in relation to the Confession of Faith, were not absolutely binding upon any church, and they may in one sense be said to only express the prevailing belief of the churches of the time; but the same is just as true, and to as great an extent, in respect to church polity. No church could be compelled to follow the Platform. But if there is any evidence that there is a common order, there is just as much evidence that there is a common faith in the denomination.

It was the system of doctrines contained in the Catechism, and not its precise statement of them in every instance, that was accepted by the churches; and since

1648 questions have arisen upon topics in some degree related to certain doctrines of the Catechism, upon which different views have been entertained, as the points in dispute between the Hopkinsians and the old Calvinists, and between Andover and Princeton. The synod gave their assent to the confession "for the substance thereof;" and it has ever since been accepted in the same manner, not literally in all cases, but substantially, as being in the main a correct compendium of christian doctrine. But in all the discussions between old Calvinists and Hopkinsians, and in relation to natural and moral inability, the Taste scheme and the Exercise scheme, and other similar topics, all parties have in general assented to the doctrines of the Catechism, and have not deemed the differences between them fundamental. The extreme of these opinions does not go beyond the Arminianism of John Wesley, which is far enough removed from Unitarianism.

What was this denomination? It was a body of ministers and churches in fellowship and communion with each other. The communion of the churches was from the beginning a fundamental principle with the Congregationalists, and distinguished their system from Independency. This is so declared in the Platform, and by writers of the best authority. Platform, ch. 15, sec. 1; ch. 2, sec. 5; Mather's Ratio Disciplinæ, 33; Upham's Ratio Disciplinæ, secs. 144, 17, 179, 5, 72.

By the recognition and just application of this fundamental principle of the Congregationalists, that there is and ought to be a communion of churches, the New-England churches became a body of churches in fellowship with each other, instead of so many mere separate churches. And upon all occasions of more general importance, councils and synods were convened, and by them and other means the churches enjoyed mutual fellowship, and exercised a communion and watch and control over each other. In particular, councils were called both

at the gathering of churches and the ordination of pastors, and thus no new party was brought into the body without the consent of the others, to whom in council was submitted the question of the fitness of the occasion and the qualification of the applicants, their piety and soundness in the faith ; and when any church or minister afterward walked disorderly, or became heretical, it was the required duty of the others, after suitable admonition, to withdraw fellowship, unless the faults were corrected.  A church thus excluded from fellowship might remain independent, or form a connection with some other denomination, but it was no longer a part of the Congregational body. The defendants contend for the right to believe what they please, without any sort of accountability to other churches.  This may all be very well, but it is not the Congregational polity ; but, on the contrary, simple independency, and this the Congregationalists utterly repudiated.

We say, then, that the Congregational churches of New-England had a common faith, which is substantially set forth in the Catechism ; that whatever modification the Calvinistic doctrines may have undergone in the orthodox churches of New-England since 1648, they are now what they were in 1817—the date of the will. Arminian views exist in some of the churches, and are considered no bar to fellowship, but the great majority are Calvinistic.  But the doctrine of the Trinity, and certain other doctrines, which are almost necessarily received and rejected with it, were always esteemed fundamental and essential, in order to admission to christian fellowship and communion.

The fact is incontrovertible that Unitarians were not commonly regarded as christians in 1648.  Not only in this country and in England, but in all reformed churches and throughout Christendom, those who denied the Trinity were looked upon with abhorrence.  It is needless to multiply authorities to this point.  Any one who does not

know that in 1648 a known Unitarian, (Socinian or Arian,) was commonly regarded in this country and in England as something very different from a christian, must be ignorant of the facts of history, or put them to a dreadful torture. He could not have obtained admission into a single Congregational, Independent, Presbyterian, or other reformed church in the world, and he might think himself fortunate if he escaped persecution as a criminal. Reading the Cambridge Platform in the light of history, one can easily decide whether Unitarians are saints by calling, within the meaning of that term as used in the definition of a Congregational church in that instrument.

Happily the time when supposed heresies were punished as crimes against the State has long since gone by, but the denomination continued to have the same estimate of the doctrines in question. Evelyn, in 1704, was convicted in Ireland, under the act of 1698, for denying the doctrine of the Trinity. The Rev. John Rogers was expelled from his office of pastor in Leominster about 1750, for suspicion of unsoundness in respect to the doctrine of original sin and the deity of Christ. Samuel Mather, about 1704, Wise of Ipswich in 1772, the elder Edwards in 1773, the younger Edwards in 1785, Bellamy, Hopkins, Emmons in 1824, Smalley in 1803, and Catlin in 1818, held the doctrine of the Trinity to be an essential doctrine of christianity; and in 1811 the General Association of New-Hampshire issued an address upon the doctrine of the Trinity, occasioned perhaps by the "Bible News," in which they declare this doctrine to be the glory of the gospel, and that which distinguishes the christian system from every false scheme of religion, and warn those whom they address against "damnable heresies." Dr. Dwight, in his theological sermons, first published in 1818, but delivered some time before, objects to the doctrine of the Unitarians, that it has compelled them to

renounce successively many other important doctrines of the gospel; such as that of human depravity, Christ's atonement, justification by faith, and regeneration by the Spirit of God; and says that the admission of the deity of Christ, if he be really God, is a fundamental doctrine of christianity, and that mistakes about it are altogether dangerous and dreadful.

It was therefore but in obedience to the settled principles and honored traditions of the denomination, and the teachings of all its most eminent writers, that it was insisted that fellowship ought not to be maintained with those who at length were open and avowed rejectors of the doctrine of the Trinity, and of the doctrines dependent upon it. *Worcester to Channing*—Panoplist.

The Unitarian movement, as has been well admitted by Dr. Ellis, of that denomination, was in fact revolutionary, and involved a radical change of opinion and practice. The springing up of this revolutionary party in no way militates against the ground that the denomination had a common faith, and that certain articles of that faith had always been esteemed fundamental and essential.

This movement was almost wholly confined to Massachusetts, scarcely reaching or affecting the other New-England States, and in Massachusetts two thirds of the churches adhered. to the faith of the fathers. Mr. Prentiss says there are now about fifteen Unitarian churches in New-Hampshire, and he recollects but one avowed Unitarian church in New-Hampshire in 1817. It is true that a silent progress can now be traced since the beginning of the century; but though Unitarianism was secretly cherished and promulgated, it studiously avoided publicity until it was exposed by Dr. Morse and others. Their sentiments were not publicly known. Unless they knew their opinions to be hostile to the christian religion, as understood and taught in the denomination, they had no reason to dread publicity, and no motive for concealment. And as

soon as Unitarianism was avowed and publicly known, a separation was demanded and effected, and those who renounced the common faith in essential articles were excluded from fellowship. The persons by whom Mr. Bridge was settled were not in fellowship with Trinitarian churches generally, and of course not with the main part of the old body.

In New-Hampshire, Unitarianism was not open and avowed till about 1825. No doubt Dunbar of Peterborough, Crosby of Charlestown, and Leonard of Dublin, and perhaps a few others, had entertained the same sentiments for some years, but in relation to the first two, at least, there could not have been a frank avowal of the fact. Dr. Leonard appears to have been less reserved, for Dr. Barstow and his delegate refused to take part in the ordination, or assent to it, on account of his opinions; and for the same reason Mr. Newell refused to exchange with him.

A few earlier exceptions do not prove either that there was not a common faith, or that certain articles of it were not deemed indispensable, even if no proceedings were instituted against the heretical parties.

The word *persuasion* is significant. It has an obvious reference to doctrine, not less, certainly, than to polity. Dr. Webster defines it to mean "a creed or belief, or a sect or party adhering to a creed or system of opinions." He assumes that every sect has a creed or system of opinions, more or less extensive. If there is any exception to this rule, Unitarianism is the exception; yet it is said by Dr. Ellis that the term Unitarian is at least but a definition of one of the doctrinal tenets of the party.

The term, Trinitarian Congregationalists, has come into use since 1817, and was unknown before. So long as there was but *one* denomination, the term Congregationalists, and other similar terms, were used; but when an open and avowed abandonment of the common faith

by about one third the Massachusetts churches took place, new terms were introduced, to distingush the *two* separate and distinct denominations. But even now, as we apprehend, the term Congregationalists, when used to designate a denomination, refers to the Trinitarian body only, unless otherwise explained.

The defendants rely on certain testimony and circumstances as tending to show that Mr. Sprague in the last years of his life privately entertained Unitarian opinions. By his public instructions and his connection with the Congregational denomination, he appeared before the public as holding to the common faith, and the court will not inquire into his *private* views. The true rule is that stated by Baron *Gurney* in the case of Lady Hewley's Charities, and adopted by Lord *Cottenham* in the House of Lords, that the existence of a religious sect, and the fact that the testator belonged to it, may be shown, and also the manner in which the phraseology in question was used by that sect; and that, in furtherance of this object, the court would ascertain from experts, from history, or works of authority, what was the common faith of the denomination. This is but the application to a particular subject of a well settled general rule, applicable to all trades, professions and customs, that the meaning of the word is to be ascertained by the usage of the time when employed, and of the body, sect or class to which the writer belonged. Greenleaf regards it as an open question, whether evidence of the opinions of the testator can be received; but the weight of authority is against it, and it is not warranted by any clear principle of law. *Attorney-General* v. *Drummond,* 1 Drury & Warren 353; S. C., 2 L. & Eq. 15; Lady Hewley's Case, 11 Sim. 592–631; *Miller* v. *Gable,* 2 Denio 491; 2 Story's Equity, sec. 1191. The particular evidence principally relied on by the defendants in this case—that of private conversations—is especially unreliable and dangerous. We submit that

none of the evidence is competent; and if the evidence is received and considered, it does not make out the fact.

If the word Congregational has a *strict and primary significance*, different from the *plain, ordinary and popular* sense of the term, the will must be construed according to the plain, ordinary and popular sense. The rule is laid down in 1 Greenl. on Ev., sec. 278. Wigram uses the words *strict and primary*, but those are not the words of the authorities to which he refers. 1 Douglas 341; 2 Ball & B. 204, 506; 5 B. & Cr. 82; *Crowder* v. *Stone*, 3 Russ. 223; 4 Vesey 330. The word *Congregational* is not a legal word, nor a technical word, but one in common use, and, therefore, may fairly be construed in accordance with common usage, whatever may have been its origin or primitive signification. The question is not what caused the separation of the Congregationalists from the Established Church, nor what gave them their name, but what did that name include?

When a denomination becomes divided into different sects, new denominational terms become necessary, to distinguish the different sects. Thus it is that we have Old School Presbyterians and New School Presbyterians; the Methodist Church North and the Methodist Church South; and, as stated by Dr. Sprague, the Congregational body has in later years been divided into two distinct denominations. For this reason he uses, and others have used, the new terms, *Trinitarian* Congregationalists and *Unitarian* Congregationalists, to designate the two distinct denominations. The introduction of these terms since the year 1817 illustrates the necessity of denominational names, and their office. Until there were two separate denominations, the old denominational names performed their office; but with the new denomination came the new names; and now, at least in New-Hampshire, we apprehend that the terms, Congregational minister, Congregational Church and Congregationalists, standing alone would be understood to refer to the Trinitarian body.

But the fact admitted in the answers, that Bridge was ordained by members of a council who were not in fellowship with Trinitarian churches, is also decisive against his claim. The defendant has no ordination except from a mere fragment of the Congregational body—from a small minority, themselves cut off from the body, because of heresy. This cannot be construed as such an ordination as the will contemplates. Let any one divest himself of all modern notions, and put himself back in the place and circumstances of Mr. Sprague, in Dublin, in 1817; an avowed, if not a really Orthodox Congregationalist; knowing well the usages and sentiments of the body, and the meaning of language as used in and by the body, and he can have no doubt as to the meaning which the testator intended to convey, or hesitate to say that neither Mr. Leonard nor Mr. Bridge answers to the description in the will.

*E. L. Cushing*, for the defendants.

The bill attacks the fundamental doctrine of the Congregational denomination, which is freedom from creeds. It alleges that no one can be a regularly ordained minister of the Congregational persuasion, who does not believe the doctrines of the Assembly's Catechism.

The will is to be interpreted by the court, and from it is to be determined who is the party to whom the beneficial interest is given, and what are the purposes of the trust.

By the law of New-Hampshire as it existed at the time of Mr. Sprague's death, towns were authorized to raise money by taxation for the purpose of supporting the ministry, and to enter into contracts with their ministers. N. H. Laws, Ed. 1792, p. 173. By virtue of this law the town had contracted with Mr. Sprague, had settled him as their minister, and a church had been formed, of which he was the pastor. But no person could be compelled to pay taxes for the support of a minister whose religious

The Dublin Case.

sentiments were different from his own. The town, with the exception of those who avoided the minister tax for this cause, constituted the Congregational Society in Dublin. Though not a corporation, the society was a distinct, well defined body, identified by its connection with the church, which, by means of its constitution and covenant, was capable of a sort of corporate identity and perpetuity. At the time of the testator's death there was no doubt as to what was meant by the Congregational Society in Dublin. Soon after the testator's death, and after the fund vested in and had been accepted by the town, towns were deprived by law of the power to raise money for the support of the ministry, and another law was passed about the same time, authorizing religious societies to assume corporate powers, for the purpose of contracting with ministers, and supporting public worship and the ministry. Under this law the tax-payers of the old Congregational Society formed themselves into a corporation under the name of the First Congregational Society of Dublin, and, in connection with the same church of which Mr. Sprague had been the pastor, proceeded to take measures for the support of public worship.

We submit that the First Congregational Society of Dublin was beyond question the Congregational Society designated in the will; and, being a corporation, and having ever since perpetuated its corporate existence, and having always been connected with the same church, still continues to be the true object of the testator's bounty.

This fund was given in fact to aid the town in supporting the ministry at a time when this was part of the duty of towns, so that the town was beneficially interested in the fund, and the testator knew that the regularly ordained minister, to whom the interest was given, must be settled by the sanction of a major vote of the town. It is also to be considered that the testator was an educated man; a clergyman, perfectly well informed as to the divisions

and differences of opinion which, within the next preceding quarter of a century, had been growing up among the Congregationalists of New-England, and which, as early as 1815, had ended in an open rupture. It was perfectly easy for the testator, if he had really preferred the system of divinity which is said to be embodied in the Catechism, to have said so in terms. It was easy to have added to the words, Congregational persuasion, the further words, "who shall accept the Assembly's Catechism for substance of doctrine."

The Congregational Society, within a few years, having rejected one or more Calvinists, who had preached as candidates, and given a call to at least one minister of well known Unitarian belief, finally settled the respondent, Leonard, who, from that time to this, has continued to be the pastor of the church and society. This society, in connection with the church to which Mr. Sprague had in his life-time ministered, settled Mr. Leonard. The defendants, in their answer, which, being responsive to the interrogatory as to the religious belief of the society and church, is evidence in the cause, say that the church continues to this day united by the same church covenant which was used in the time of Mr. Sprague, and which was copied from a draft in his handwriting; and there is in the case the testimony of one witness, who says that he remembers hearing the covenant frequently read, and believes it was substantially the same as the covenant now in use.

The town of Dublin as trustee sanctioned this proceeding, and applied the income to the support of the respondent, Leonard, and, after he ceased to preach statedly, to the respondent, Bridge.

This practical contemporaneous construction of the will does not appear to have been questioned at the time. It does not appear that any one at that time doubted that the term "Congregationalist," as used in the will, was

broad enough to embrace Mr. Leonard, and of course Mr. Bridge, and for a period of nearly forty years that society, with the full assent of the town, enjoyed, without disturbance, the benefit of the trust fund. It was not till the lapse of nearly half a century was supposed to have obliterated most of the facts which have been deemed important in the investigation of the question, that it was thought convenient to stir up this controversy. If ever there could be found a case in which long and undisturbed possession could be held to furnish evidence of right, this is certainly that case.

The town of Dublin is a proper trustee to hold this fund. By the law in force at the time of the testator's death, towns were empowered to raise money for the support of public worship, and to make binding contracts with their ministers. The support of public worship being thus within the scope of their municipal powers, they might hold funds in trust for that purpose, and any trust which a town had accepted would not be affected by the statute which took from towns their right to support public worship. *Trustees* v. *Peaslee*, 15 N. H. 317 ; *Trustees* v. *King*, 12 Mass. 246.

Next let us consider the purposes of the trust. It is now alleged that for a period of nearly forty years, and covering the whole time since the testator's death, there has been on the part of the town a breach of the trust and confidence placed in it, and that the trust fund has been misapplied, and devoted to purposes not contemplated by the will.

The bill alleges that the respondents, "Leonard and Bridge, are not regularly ordained ministers of the Congregational persuasion, in the sense in which those words were used in said will, and in which they were generally used and understood, when said will was made and took effect; but, on the contrary, are ministers of the Unitarian persuasion, and while, in common with Universalists

and Baptists, holding to the same ecclesiastical polity, that they differ widely and radically from most or all persons of the Congregational persuasion upon certain fundamental doctrines, which were held by the said Sprague, and which were commonly held, when said will was executed, by members of the Congregational persuasion, and which doctrines are in substance those contained in the Assembly's Catechism, so called, taken as a whole; and in particular .the doctrine of the Holy Trinity, of native, total depravity, of vicarious atonement by Jesus Christ, of a supernatural regeneration by the Holy Spirit, of the eternal punishment of the wicked and of the full inspiration and binding authority of the Holy Scriptures; some or all of which are rejected by the said Leonard and the said Bridge, and by the church and society with which they are connected."

The substance of the bill is contained in the foregoing passage. It tacitly assumes a principle which runs through the whole of the relators' case, and which we believe to be utterly unsound. It does not go upon the ground that the respondents, Leonard and Bridge, are not Congregationalists, nor on the ground that their doctrines are not held by some Congregationalists, but it assumes substantially that the term, "Congregational persuasion," embraces only those Congregationalists who agree with the majority. It tacitly denies the fundamental principle of Congregationalism, that each church has a right to make and alter its own creed at its own pleasure, and assumes that whenever a particular church differs from what a majority of the Congregational churches deem fundamental, it is no longer a Congregational church. For instance, when, in the early part of the present century, the schism took place between the two parties severally called the orthodox and the liberal, it was, according to the principle assumed by the bill, a mere question of numbers, which should be termed Congregationalists. It seems to us that this principle is entirely false and absurd.

The real question is to determine what the words " Congregational persuasion," as used in the will, mean. The intention of the testator as expressed in the will is to be carried out, provided it is not unlawful. The results of the cases on the construction of wills have been concisely and clearly stated by Wigram in seven propositions. According to the first of these propositions, " a testator is always presumed to use the words in which he expresses himself, according to their strict and primary acceptation, unless, from the context of the will, it appears that he has used them in a different sense ; in which case the sense in which he thus appears to have used them will be the sense in which they are to be construed." And according to the second of those propositions, " where there is nothing in the context of a will from which it is apparent that a testator has used the words in which he has expressed himself in any other than their strict and primary sense, and where his words so interpreted are sensible with reference to extrinsic circumstances, it is an inflexible rule of construction that the words of the will shall be interpreted in their strict and primary sense, and in no other, though they may be capable of some popular or secondary interpretation, and although the most conclusive evidence of intention to use them in such popular or secondary sense be adduced."

There is nothing in the context of this will to show that the terms of it are used in any popular or secondary sense. The terms are intelligible in themselves ; there is no latent ambiguity required to be explained by evidence, and the terms, Congregational persuasion, must be interpreted according to their strict and primary meaning.

These propositions of Mr. Wigram are referred to by Greenleaf in terms of high commendation. It is true that the counsel for the plaintiffs insinuate that Professor Greenleaf had commended Wigram's conclusions without exactly knowing what his doctrines were, and without

any suspicion that they were different from the rules of interpretation, as laid down in his own book; but we do not think Mr. Greenleaf guilty of such negligence or obtuseness, and believe that Mr. Greenleaf's doctrines, fairly understood, are the same with those of Mr. Wigram.

It was at one time supposed that a different rule might prevail with regard to religious charities, and Lady Hewley's Case certainly did go a great way toward confounding the whole law in regard to the construction of written instruments. The final discussion of the *Attorney-General* v. *Drummond*, in the House of Lords, has, to some extent, brought back the law to what it was before, and to the principles of common sense. The doctrine of Lady Hewley's Case has been justly reprobated by Judge Story, and probably never was law in this country. Story's Equity Jurisprudence 539.

Applying the principles of interpretation as cited from Wigram, what is the true meaning of the words, " Congregational persuasion."

1. The bill itself proceeds on the ground that the term, *Congregational persuasion,* was broad enough to include the respondents, Leonard and Bridge, and their society; for it says that they hold opinions different from most members of their persuasion, and that they differ upon certain fundamental doctrines commonly held by members of that persuasion. According to the bill, there are Congregationalists whose belief is the same as that of the respondents, Leonard and Bridge.

2. No author has been cited by the relators' counsel of the period of 1817, or earlier, who uses the term Congregational and Congregational persuasion in any sense different from that which the respondents contend for, viz., as denoting polity, discipline and worship.

3. In 1680 the Synod says, " nor was it that, (i. e., doctrine) but what concerns worship and discipline, that

caused our fathers to come into this wilderness while it was a land not sown, that so they might have liberty to practice accordingly." Would any man say that at that time Congregationalism denoted anything but polity, discipline and worship !

4. In Adams' Dictionary of all Religions, 60, Congregationalists are said to be " a denomination of Protestants, who maintain that each particular church has authority, from Christ, for exercising church government and enjoying the ordinances of worship within itself." In the appendix to the fourth edition, published in 1817, occurs this passage : " The Congregationalists are the predominant religious denomination in each of the New-England States, Rhode-Island excepted. They are divided into Calvinists of the old school, a large number of Hopkinsians, Arminians, Unitarians of different grades," &c.

5. In Benedict's History of all Religions, published in 1824, p. 193, the author, speaking of the Convention of Congregational ministers in Massachusetts, says : " This convention embraces all regular ministers of the *Congregational persuasion*, whatever their theological opinions may be ; and as a large proportion of them are Unitarians and otherwise anti-orthodox," &c. On page 194, speaking of the Congregationalists, he says: " Many in former periods have inclined to Arminian principles, and in modern times a considerable number in Massachusetts, and a few in other States, have now fully renounced the opinions of their ancestors, and adopted those of a more liberal description."

6. In the Encyclopædia of Religious Knowledge, edited by B. B. Edwards, and published in 1836, is an article on Congregationalists, which purports to have been written by Mr. Charles Rockwell, and revised by Professor Emerson and Dr. Wisner. The definition of the term, " Congregationalists," is as follows : " A class of Protestants, who hold that each congregation of Christians, meeting

in one place, and uniting by solemn covenant, is a complete church, with Christ for its only head, and deriving from him the right to choose its own officers, to observe the sacraments, to have public worship, and to discipline its own members. In the same article it is said: "The Bible is the only standard by which to test heresy. The church are not bound by any one creed, but each church makes its own, and alters it at pleasure."

7. About the year 1810 a change was made in the constitution of Harvard University, by which it was provided that a certain portion of the board of overseers should consist of ministers of Congregational churches in Massachusetts. From 1810 to 1843 fifteen ministers were elected into the board of overseers, of whom only one was from that branch of the denomination styled Orthodox; and in the midst of all the complaints about the exclusive spirit of Unitarians, no man ever suggested that Unitarians were not Congregationalists, as the word was understood and used in 1810, when that law was passed. 2 Quincy's History of Harvard University, 295, 301, *et seq.*

8. In 1845, Dr. Codman, a distinguished Orthodox divine, born in 1782, settled in 1808, died in 1847, made a report to the overseers of Harvard University, signed by him as chairman of a committee, in which he says: "Between the years 1810 and 1843, while elections were confined to the Congregational denomination, fifteen clergymen have been elected; fourteen from that part of the denomination known as Unitarian. Although the nominating lists have never been without other candidates, there has been but one instance during a period of thirty years of a selection being made from the Orthodox part of the Congregational denomination." This of course covers the period of 1817. In this report we meet with such phrases as these: "Orthodox Congregationalists," "a Congregationalist, whether Orthodox or Unitarian," "Orthodox or Unitarian Congregationalist." It seems

incredible that Dr. Codman should not have been familiar with the use of the terms, *Congregational* and *Congregationalists*, and that he should have so used the terms, if that had not been the recognized signification in 1810, and at all times afterwards. It is incredible that during the long controversy, when the Orthodox, as they call themselves, were moving heaven and earth to get the control of Harvard University, it should have occurred to no one of the zealous and acute ministers and lawyers concerned in that contest, that the term *Congregational*, as used in 1810, was confined to those who accepted the Assembly's Catechism, "taken as a whole," and "for substance of doctrine," and that it did not include Arminians, Unitarians, and other Christians of liberal views. It was left for the relators' counsel to make this interesting discovery forty-eight years after the statute was enacted.

9. The History of "the Convention of Congregational Ministers of Massachusetts" is another instance of the usage of language. Since 1692 their meetings have been regularly held, and, after a sermon, a collection has been taken, the proceeds to be applied to the support of such widows and children of deceased Congregational ministers as have been or shall be settled in Massachusetts. The Massachusetts Congregational Charitable Society was incorporated in 1786, to hold the funds of the Convention. Unitarians and Trinitarians have been indiscriminately elected members, and the funds applied to the aid of Unitarian and Trinitarian Congregationalists without distinction.

10. In 1840 was published the Report on Congregationalism, by a committee of which Dr. Leonard Woods was chairman. On page 19 commences a statement, entitled, "General Principles of Congregationalism." In that statement, contained in pages 19, 20, 21 and 22, there is not one word said about any system of doctrines or theological opinions as belonging to the principles of Congregationalism.

There is a little hypercriticism in the argument for the relators, on the word *persuasion*. In the passage quoted from Benedict's History of Religions, the word *persuasion* is used exactly in the sense in which we use it. A man's *persuasion* is what he believes in regard to the subject matter to which the term is applied. The Congregationalist persuasion applies to those who believe the Congregationalists' polity is that of the New Testament.

Such is the evidence of usage of the term Congregational, derived from standard authors. We do not recollect a single instance cited on the other side, in which the term has been used in any different sense by any writer of the period of 1817, or prior to it.

And the evidence in the case shows that the term Congregational has been understood to include, in New-Hampshire as well as elsewhere, different theological opinions, as in the case of Dr. Crosby, Mr. Dunbar, The Peterborough Catechism, and others.

Having settled the meaning of the words *Congregational persuasion*, the rules of construction require that the terms should bear that signification, unless there is something in the context of the will which shows that the testator has used them in some other sense. In this case it is not contended that there is any thing in the context that has any bearing on the question.

Nor are the words of the will insensible with reference to extrinsic circumstances. We understand that the only legal use of evidence to surrounding circumstances is to disclose and explain latent ambiguities; as, where the testator gives a legacy to his nephew Samuel, and the evidence shows that he had two nephews of that name; or to Catherine Earnly, and there is no such person as Catherine Earnly. In this case there is no such latent ambiguity, and no extrinsic evidence can be received to vary or control the plain and intelligible language of the will.

It is said the Congregational denomination was a body of ministers and churches in fellowship and communion with each other, and that the doctrines contained in the Shorter Catechism, as modified to some extent by the teachings of the New-England divines, constituted the common faith of the denomination; and the argument is, as we understand it, that, by the communion and fellowship of churches, a control could be kept up by the major part of the churches, so that, by excluding the minor part from their fellowship and communion, they could exclude them from the denomination. We had supposed that the fundamental principle of Congregationalism was the right of each church to make its own creed; a right which no church or body of churches, or council, could control. The doctrine of the communion and fellowship of the churches is this, "that in case a public offence be found in a church, though churches have no more authority one over another than one apostle had over another, yet, as one apostle might admonish another, so one church may admonish another without usurpation:" "and if the church which lieth under offence doth not hearken, the neighboring churches may be called on, and if still the offending church continue in obstinacy and impenitency, they may forbear communion with them, and may make use of the help of a synod or council; and if they hear not the synod, having declared them obstinate, *particular churches approving and accepting the judgment of the synod,* are to declare the sentence of non communion respectively concerning them." See Cambridge Platform. Every particular society is a complete church, and, as far as regards other churches, immediately and independently under Christ alone. "The churches are not bound by any one creed, but each church makes its own, and alters it at pleasure." "Other churches can admonish, and, if they see fit, withdraw fellowship." "All that synods and councils have done is to set forth the prevailing belief of

the churches at the time they were held." "The Bible is the only standard by which to test heresy." Encyclopedia of Religious Knowlege.

This withdrawal of communion, then, was, after all, the act of individual churches, and still left the offending church Congregational and in the full possession of all its rights. The churches might admonish one the other, and might withdraw fellowship, just as the apostles might admonish one the other; but Barnabas and Paul did not cease to be apostles because they quarreled and parted company, neither did a church cease to be a church, or congregational, because another church had excluded it from their fellowship. The Bible is the only test of heresy. A church would not necessarily be wrong because it was in the minority. The straight and narrow path, with few walking in it, may be the road that leads to life. It is plain that no church could in any way lose its rights, or be controlled by this withdrawal of communion, and other churches might still keep up that communion, notwithstanding the promulgation of decrees or recommendations of councils or synods.

It is contended, by the counsel for the relators, that the differences of doctrine which have been admitted within the Congregational denomination are not to be regarded as fundamental, and matters of substance. In this branch of the case there is a certain lubricoseness in the argument which makes it extremely difficult to grasp. It is not the Catechism in itself and by itself, but it is the Catechism "taken as a whole and for substance of doctrine." When the relators' counsel is interrogating the respondents in the bill, it is the Catechism, nothing more or less, which they are required to accept in all its details; but when he is sweeping with his drag net, beliefs of every shade and hue into what he calls the common faith, he is then content with "substance of doctrine." Any thing will do, provided it is not branded with the hated name

of Unitarianism. We believe it is true, and that the relators' counsel ought to know, that in the term *Unitarian* have been included many christians, whose language in regard to the Trinity does not differ from that of those who are held to be orthodox. In the same spirit of misrepresentation the relators' counsel speaks of the difference between Arminians and Calvinists as being slight.

Few religious controversies have ever raged with more fury than that between Arminians and Calvinists. Undoubtedly the leading dogma of Calvinisim is predestination. " The word Calvinist," says Sir James Mackintosh, 2 History of England, 144, " now denotes all who in any protestant communion embrace the doctrine of absolute predestination." This doctrine, which is nearly the characteristic dogma of the Calvinist, though holding a large place in the Catechism, " as a whole," is entirely lost sight of in the particulars stated in the bill. Is it contended that this doctrine is not fundamental and essential, or is it left out on account of the well known fact that Mr. Sprague during his whole life never ceased from the most unsparing ridicule of that doctrine ? This doctrine was wholly denied by the Arminians. The views of the Arminians were so different from those of the Calvinists, that at the Synod of Dort the Arminians were found guilty of heresy and of hostility to their country and its religion, were excommunicated, driven from all their civil offices, their ministers prohibited from preaching, and their congregations suppressed. Barnwell was murdered under the forms of law, and Grotius sentenced to perpetual imprisonment. Encyclopedia of Religious Knowledge, articles, Calvinism, Arminianism ; the Natural History of Lutheranism, cited Encyclopedia of Religious Knowledge, 308. We suppose we may assume that Arminians do not accept the Catechism for " substance of doctrine," either taken as a whole or in detail.

Towards the close of the seventeenth century the strict

Calvinists had begun to detect signs of defection of por-
tentous import. About 1740, there were two distinctly
recognized parties in the church—the Calvinistic and the
Arminian. There were some churches whose position
was not defined, and who did not seem to wish to define
it. Towards the last of the eighteenth century, some had
gone beyond Arminianism, and become Arians and Uni-
tarians, like the Rev. Lemuel Bryant, of Quincy; the
Rev. Mr. Shute, of Hingham; the Rev. John Brown, of
Cohasset; the Rev. Mr. Gay, of Hingham. The final
drawing of the lines between the two parties was by so
gradual a process that it was not easy to mark its com-
mencement or its termination. In this State, before 1817,
there had been the same progress and division of opinion
in the denomination. Dr. Crosby, who is now classed
with Unitarians, derived his religious opinions from Dr.
Appleton, who was what was then called an Arian, and
made no secret of his opinions. The tract written by
Mr. Wallace, with a highly commendatory introduction
by Dr. Dana, of Newburyport, shows conclusively that
among those in New-England who claim to be most
orthodox, there are wide and vital differences of opinion.

We think we are entitled to say that there is no system
which can in any just sense be said to be the *common faith*
of Congregationalists. It is plain that, for at least a cen-
tury and a half, and perhaps for a longer period, there
have been wide differences of opinion among the Congre-
gational churches and ministers; that these differences of
opinion were patent on the face of the contemporaneous
theological literature; that they were of every shade and
degree, ranging all the way between strict Calvinism on
the one side, and Arianism, which is Unitarianism, on the
other; that during all this time the churches have exer-
cised their individual rights, each preserving a commu-
nion and fellowship with sister churches, more or less inti-
mate, or entirely abstaining from it, according to its own

affinities, and this is precisely what should have been expected from the principles of Congregationalism. Councils have had no recognized right to control the opinions of individuals or churches. Attempts, we believe, have been made more than once to bring the Congregational body, by the aid of consociations and other machinery, under the inquisitorial dictation of the priesthood, but hitherto they have most signally failed. All that synods have done, or could do, was to express the doctrinal belief of the persons who composed them.

It is objected, that the religion of Mr. Leonard and Mr. Bridge, and of their church and congregation, is not the Christian religion. The word Unitarian is one of broad significance, embracing a great variety of theological opinions. The respondents have answered particularly as to the theological opinions of the First Congregational Church and their ministers, and the question is whether their belief, as expressed in the answers, is embraced within the term Christianity, as used by the testator. The meaning of the term Christian religion is to be determined on the same principles as the meaning of the terms Congregational persuasion. By the term Christian religion must be meant the religion which Christ taught. This is not only the natural, but the historical sense; it is the sense in which the words have always been used. There can be no doubt that the respondents, Leonard, Bridge, and the parish, are in this sense of the term Christians.

We maintain that no evidence can be received of Mr. Sprague's opinions, to control the meaning of the terms he has used in the will. But if this evidence is to be considered, it does not appear that, either in his public instructions or his private conversations, he held opinions different from those of Mr. Leonard and Mr. Bridge. There can be no distinction between his statement of his opinions in public and in private. It is not to be pre-

sumed that he held opinions in private which were sincere, and taught publicly other doctrines, in which he did not believe.

In conclusion, the respondents say—

1. The term Congregational does not relate to what is called doctrinal belief, but relates solely to ecclesiastical polity, discipline and worship.

2. Neither by the principle of communion of churches, nor in any other way, had synods or councils any authority to establish a common faith. They could only declare their own belief at the time. Exclusion from communion and fellowship was the act of individual churches, and amounted to nothing more than the individual act of each church.

3. The Congregational body never had what could be justly called a common faith; but each church, forming its own creed and determining its own fellowship, the whole body of churches embracing every variety of doctrinal belief, ranging from strict Calvinism through Hopkinsianism to Arianism, or Unitarianism, and that this is matter of history, patent on the contemporaneous theological literature.

4. The term *Christian* has a well settled historical and theological meaning, and embraces all who profess to be disciples of Christ, and therefore the respondents, Leonard and Bridge, are regularly ordained ministers of the Congregational persuasion, since the answers show that they are Christians who adopt the Congregational polity, discipline and worship.

If, however, it should be held that the case discloses a latent ambiguity, to be explained by extrinsic evidence, we contend that the testator and his church, in 1817, held the same doctrinal belief that is now held by the respondents, Leonard and Bridge, and the respondent society.

*Morrison*, in reply.

The Platform, cited by the defendants' counsel to his position, that the fundamental principle of Congregation-

alism was the right to make its own creed, affords him no support. The Cyclopædia of Religious Knowledge was published in 1842 instead of 1836; was edited by J. Newton Brown, instead of B. B. Edwards. We are not aware that Mr. Charles Rockwell and Prof. Emerson and Dr. Wisner have ever been regarded as authority on this subject, and the article as a whole is against the assumption of the defendants; for the particular statements cited by the defendants are qualified by the further statements, that every true church must receive the doctrines of the word of God, and that upon the gathering of a church the council, when practicable, examines the confession of faith.

Robinson, in the passage cited to this point, only means to assert that no control can be exercised over any church "by means of pains and penalties;" and Congregationalism, as a system, was perfected by others, and owes more to Cotton than to Robinson. Upham is explicit, that no Congregational church could be formed whose private confession of faith should be found at variance with the fundamental principles of the general confession or creed of the whole body. Upham's Ratio Disciplinæ, 1826.

It is said that refusing fellowship would not exclude a church from the Congregational body; but whatever may have been the theory, the decision of councils was in most instances at least conclusive, and it was a first principle to maintain the communion of churches, and in some way, after due means with patience tried, the heretical and disorderly were cast out; and, therefore, no Congregational church had an unqualified right to make or alter its creed. The majority would not, as is argued by the defendants, govern, unless they maintained the ancient faith; for the union, having been formed by those who at the time had a common faith, if it were renounced by the majority, the minority would be regarded as standing upon the old foundations, and having the true doctrines of the denomination.

The doctrine of the Trinity, and certain others, which are almost necessarily received and rejected with it, were always esteemed fundamental and essential in order to Christian communion and fellowship. This is shown by the uniform testimony of history; by the votes of the synods in 1648 and 1680; in the proceedings of the General Association of the State; in the almost universal use of the Catechism; in the works of the most distinguished writers among the Congregational divines, from the beginning to the date of the will—Robinson, Hooker, Cotton, Norton, Wise, Hopkins, Bellamy, the Edwardses, Emmons, Catlin; and Dwight and Upham, who wrote not long after the date of the will.

The Unitarian movement was not inconsistent with this position; for it was, as admitted by Dr. Ellis, revolutionary in its character, almost wholly confined to Massachusetts, and even there two thirds of the ministers and churches adhered to the faith of the fathers. The Unitarians did not for years openly and frankly disclose their opinions, but studiously avoided publicity. It was much against their will that their secret opinions were "exposed before the multitude;" and when the light of day shone in upon them, a separation in all ecclesiastical matters was demanded and effected; and, as stated by Dr. Sprague, the two parties became in fact two denominations. In the Massachusetts Convention of Congregational ministers the Unitarians and Orthodox have no ecclesiastical association.

The few instances in which Arian or Unitarian opinions existed in the denomination previous to 1812, cannot be said to have been allowed and tolerated, because they were not avowed and publicly known; and it is not true that the views of Arminians were regarded as essential and fundamental. Barnevelt was condemned for treason against the state, and his conviction procured for reasons of state by Prince Maurice, who was himself an Arminian in his private belief; and one of the charges against

Arminius was that he attempted, under specious declarations, "to insinuate the poison of Socinianism and Pelagianism." Calvinism was predominant, Arminianism was tolerated; but when the separation took place, Unitarianism was cast out.

Unless in a single instance, late in the cause, we have taken no testimony to prove the religious opinions of the testator, except as they are to be inferred from his communion with all the denomination. We proved what he preached and did as a minister, for this proved his connection with the main body; but did not attempt to prove mere private opinion, and insist that such evidence is wholly incompetent, and under this protest we examine the other evidence.

If the term Christian religion is to be construed in accordance with what the Congregational denomination as a body had always understood as essential in order to constitute the Christian religion, the defendants, Leonard and Bridge, are not entitled to the interest of the fund; nor, if the term is to be construed in accordance with what the great majority of all denominations calling themselves Christians had always understood to be thus essential. The defendants' counsel rejects both these tests, and says that the *Christian religion* must mean the religion which Christ taught, and *Christians* those who accept and believe the teachings of Christ. As the court cannot decide what it was that Christ taught, he must mean that it is sufficient for one to profess to believe Christ's teaching as he understands it. But Theodore Parker, in his own estimation, is a Christian, and the pastor of the twenty-eighth Congregational church in Boston; but inasmuch as he does not believe all that Christ taught, thinking him sometimes mistaken, he is not a Christian, within the definition of the defendants' counsel. We seem to be agreed, then, that there must be a *creed* of some sort, that will exclude from the benefit of the trust some who lay claim to the name of Christians.

But the term *Christian religion* has not any such legal and settled meaning as the counsel seek to fasten upon it. With a person of one faith it means one thing, and with a person of an antagonistic faith it means something different; and where is the antagonism greater than that between Unitarians and Trinitarians? In *Princeton* v. *Adams*, 10 Cushing 129, Chief Justice *Shaw* says, "from the earliest days of Christianity they have always been deemed, as they are in our day, antagonistic systems." The true rule is that applied in the English courts, and generally recognized in this country, that such terms, if there is nothing to control them, shall be construed according to the usage of the denomination to which the testator belonged; and, as showing what this usage was, the doctrines which were commonly received in the denomination may be proved.

We agree with the counsel on the other side, that the general language of an instrument cannot be restrained by the peculiar views of the maker; but to show the existence of a particular sect, and the sense in which the words were used by it, and subsidiary to this, the doctrines which it commonly received and deemed essential, and that the testator was a member of it, is quite another thing, and what a well settled rule of law allows; and when this is done it will be presumed that the words were so used in the sect. Greenleaf says: "When words have two meanings—the one common and universal, and the other technical, peculiar or local—parol evidence is admissible of facts tending to show that the words were used in that latter sense, and to ascertain their technical and local meaning." "The same principle is also applied in regard to words and phrases used in a peculiar sense by members of a particular religious sect." 1 Gr. Ev., sec. 295. Now it is evident, from the authorities before cited, that the doctrines of the Trinity, of vicarious atonement and justification by faith, not to mention others, had always, by

the denomination as a body, been esteemed and required as essential, and so essential that what is left without them is not the Christian religion.

The denomination, at the date of the will, and particularly in this State, was substantially a unit upon these doctrines. The Unitarians, who were just showing themselves in a neighboring State, and about to be turned out of doors, cannot be regarded as tenants in common of the premises. They were like a tenant holding over after his lease had expired, and who has received notice to quit. They had no standing in the denomination anywhere, and much less in this State. But if we take the other view, and consider the denomination as then divided into two parties, Trinitarian and Unitarian, the result will be the same. All of Mr. Sprague's ministerial acts, from first to last, identify him with the main body. Evidence of his private opinions is inadmissible, but if received he is still found with the Trinitarians. He did not differ from the most Orthodox except upon the decrees.

In fact, since their separation, in all ecclesiastical affairs the Trinitarians and Unitarians have constituted two distinct denominations; the former generally designated by the old denominational names, and in a few instances as Trinitarian Congregationalists, and the latter as Unitarians, or Unitarian Congregationalists, and seldom if ever simply as Congregationalists. According to all ordinary use of language they are separate denominations, and have been so regarded, as appears by the proceedings of the Massachusetts Convention. A committee was appointed in 1847 to take into consideration the relations and rights of the respective denominations in the convention, consisting of twelve members, half Orthodox and half Unitarian, who in their report express the hope that the relations of the *denominations* in the Congregational and Charitable Society will be satisfactorily arranged.

The Massachusetts Convention of Congregational Min-

isters, and the Congregational Charitable Society, subsidiary to it, had their origin long before Unitarianism was developed, and in 1816 a large fund had accumulated. The Trinitarians were generous enough to permit Unitarians to share in the common fund. Has their liberality in this respect ever been followed ? But these organizations became, as stated by Benedict, mere charitable institutions ; and in relation to these organizations, by which the Unitarians retained a sort of connection with the old body, the words denomination and persuasion have sometimes been so used as to include them.

In the years 1810 and 1814, when the alterations were made in the rules for the overseers of Harvard College, the institution was under the control of the Unitarians, and they show *their* liberality by electing fourteen out of fifteen of their own number. They may or may not have correctly interpreted rules formed by themselves, but either way it is not very material.

The minister who has the benefit of the fund must be regularly ordained. The settled usages of the denomination require that a council shall be called of the *neighboring churches ;* of course of the denomination fellowshipped by it ; and this not only as matter of convenience, but as necessary to prevent the ingress of a troublesome neighbor, and to maintain the faith and order of the churches in their simplicity and purity. Mr. Leonard and Mr. Bridge were not thus regularly ordained. The answer admits that Mr. Bridge was not ordained by a council in ecclesiastical connection with the Cheshire Conference, or other Trinitarian churches. In fact, neither of them could have been settled in Dublin in the regular way by a council from the neighboring churches. Dublin was then, and always had been, surrounded by Trinitarian churches, and hence the defendants did not come by the door in the regular way with the consent of the neighboring churches. At Leonard's settlement the church in Keene was repre-

sented, and the delegates protested against the ordination.

The statement in the answer, that a certain paper is, as the defendants are informed and believe, a true copy of Mr. Sprague's covenant, is not evidence, as it is not responsive to the bill, and does not state any thing as matter of which the defendants have personal knowledge. As to the long possession, the time was still longer in the English cases, and no length of time is a bar to a trust. The examination of Dr. Leonard was not public. His views became gradually known, and it was not till 1827 that they were so fully and generally known as to cause the separation. The defendant society had the fund to work with, and a minister deservedly popular as a man. The plaintiffs were poor, and hesitated long before resorting to the courts. All this surely furnishes no reason why justice should be denied them, or the fund be misapplied in all coming time, as it has been in the past.

PERLEY, C. J. The income of the fund in question was paid by the trustees to the Rev. Levi W. Leonard while he preached in the First Congregational Society, and has been paid to the Rev. William F. Bridge since he was settled as colleague with Mr. Leonard. This, it is alleged in the bill and information, is a misapplication of the fund, and a violation of the trust, because Mr. Leonard and Mr. Bridge are not, and have not been, ministers of the Congregational persuasion, within the meaning of those terms as used in the will of Mr. Sprague. The ground is taken that, though the First Congregational Church and Society may be Congregational in form, and though Mr. Leonard and Mr. Bridge may claim to be of the Congregational persuasion, and may have been regularly ordained as such, yet, on account of the doctrines and theological opinions which they hold and teach, they are not ministers of the Congregational persuasion, in the sense of those terms as used in the will.

The bill states that Mr. Leonard and Mr. Bridge are not ministers of the Congregational persuasion, but of the Unitarian persuasion; that the doctrines of the Congregational persuasion are substantially those set forth in the Assembly's Catechism; particularly the doctrines of the Holy Trinity, of native total depravity, of vicarious atonement by Jesus Christ, of a supernatural regeneration by the Holy Spirit, of the eternal punishment of the wicked, of the full inspiration and binding authority of the Holy Scriptures; that some or all of these doctrines are rejected by Mr. Leonard and Mr. Bridge, and by the church and society with which they are connected.

The answers of the defendants are the only evidence before the court that can be relied on to show the opinions held by Mr. Leonard and Mr. Bridge, or by the church and society. We are not able to perceive any difference, that can affect the case, between the opinions held by Mr. Bridge and those held by Mr. Leonard; and the complainants do not, either in the bill or in argument, rely on any such difference, nor contend that, since the first appropriation of the fund, in 1820, there has been any change, that is material to be considered, in the opinions of the ministers, or of the church and society.

The first answers were excepted to, and further answers filed. The explanation given in the answers, of the religious opinions held and taught by Mr. Leonard and Mr. Bridge, runs into a good deal of length. They answer very fully and minutely as to their own religious opinions, and set out the church covenants in use by them respectively. These covenants are alike, with some variations, which, so far as the court can undertake to judge of such a question, are merely verbal. The defendants also set out in their answers a church covenant, which they say they are informed and believe is a true copy of one in the hand-writing of Mr. Sprague, and which was in use when Mr. Sprague was minister.

The covenant used by Mr. Bridge is in the following terms :

"Apprehending it to be your duty to make a public profession of the Holy Christian Religion, and being desirous to unite yourself with the church of Christ in this place, you do this day avouch the Lord to be your God, yielding yourself up to him to be his servant, and choosing him to be your portion forever. You give up yourself unto the God whose name alone is Jehovah, to walk in his ways, to keep his commandments, and to hearken unto his voice, declaring your firm assent unto the truths, and your hearty consent unto the terms of the gospel.

"You accept of Jesus Christ in all his glorious offices, prophetical, priestly and kingly, and depend on him in the way which he hath prescribed, for instruction, pardon and eternal life. You profess your serious resolution to deny, as the grace of God teaches, all ungodliness and worldly lusts; to live soberly, righteously and godly in this present world, and to endeavor that your conversation may be such as becomes and adorns the gospel. You promise, by the help of God's grace, to walk in all the ways of holy communion, as joint heir in the family of Christ ; to keep the faith, and observe the order of the gospel ; cheerfully to support and conscientiously to attend the public worship of God, in all the instituted duties thereof, and to submit to the discipline of his kingdom.

"All this you do in the presence and fear of God, with a deep sense of your unworthiness to be admitted into covenant with him, and to enjoy the privileges of the church evangelical, and of your insufficiency to perform the duties of it without his gracious assistance; and you rely on and pray to the God of grace, who brought again from the dead our Lord Jesus Christ, that great Shepherd of the sheep, that through the blood of the everlasting covenant he would make you perfect in every good work

to do his will, working in you that which is well pleasing in his sight, through Jesus Christ.

" Now, therefore, in the presence of God, whose eye is over all, and in the name of Jesus Christ, his well beloved Son, I declare you to be a member," &c.

Mr. Bridge says in his answers that he believes in the Father, the Son, and the Holy Ghost, one in purpose and design, but he does not believe them to be, in the words of the Catechism, one in substance, equal in power and glory ; that he believes in the divinity of Jesus Christ in the sense that he is of a divine nature, but as to the supreme divinity of Jesus Christ he does not know that he understands what is meant by it, but he does not believe in it in any sense in which he can understand the terms ; that he believes in the personality of the Holy Ghost ; in the depravity of men, but not in the native and total depravity of the entire race of men ; in the atonement, in the sense of reconciliation by Jesus Christ, not in the vicarious atonement by Jesus Christ ; in the regeneration by the Holy Ghost, but cannot understand how the term supernatural can in any sense be applied to it ; in the future punishment of the wicked, and those who die in impenitence, but not in eternal punishment ; that he does not believe that Christ offered himself up a sacrifice to satisfy divine justice, but does believe that Christ offered himself a sacrifice to reconcile men to God ; that he believes the scriptures of the Old and New Testament contain a divine revelation, given by inspiration of God, and that they contain a perfect and the only rule of faith and practice, and in their binding authority, and that in this sense he believes in the full inspiration of the Holy Scriptures, but in no other sense in their full inspiration ; that he does not believe in all the doctrines contained in the Catechism ; that he rejects the doctrines of election, of predestination, of the perseverance of the saints, and of justification, as they are set forth in the Catechism.

Though not formally admitted by the answers, it is conceded in argument that the defendants, Leonard and Bridge, do not belong to the Trinitarian or orthodox division of those who claim to be Congregationalists, but to the Unitarian division. As, however, we understand that the general term *Unitarian* embraces a considerable extent and diversity of religious doctrine, we have thought it necessary to look into the expositions, which the answers give, of the particular opinions held by Mr. Leonard and Mr. Bridge. The question on this part of the case is, whether these opinions of Mr. Leonard and Mr. Bridge are such as exclude them from the Congregational persuasion, and from being beneficiaries under the will of Mr. Sprague.

The donor of a public charity has the right to dispose of his gift to any use that is not illegal. In this State all divisions and sects of the Christian religion stand before the law, so far as the present question is concerned, on a footing of perfect equality. The founder of this charity had the legal right to limit the application of his bounty to the support of Trinitarian or of Unitarian doctrines ; or to leave it indifferently, to be applied by the trustees to the support of either or both ; and if a fund is given for the support of a particular religious doctrine, or of a certain system of religious doctrines, it would be the duty of this court, on a proper application, to see that the trust was executed according to the intention of the donor, provided that his intention was expressed so plainly that it could be legally ascertained.

When the intentions of the donor as to the religious opinions which he means shall be supported, are expressed in general terms, and the disputed construction of those terms depends on an examination of religious doctrines, and the history of theological opinion and controversy, the inquiries upon which the court are obliged to enter are of an unusual and embarrassing character. What is

theologically true in religion it is agreed on all hands that the court are not competent to decide; nor have they power to determine what is really and intrinsically substantial and essential in matters of doctrine. The difficulty of considering, in legal tribunals, questions which depend on such inquiries, has led courts to act upon the rule that they will not interfere with the application which a trustee has made of a fund given to a religious use, upon the ground that the donor intended to limit the application of the fund to the support of different theological opinions, unless the intention to exclude the opinions to the support of which the fund has been applied, has been plainly expressed by the donor. Courts of law are, by their habits and constitution, ill fitted for the investigation of such questions; and it will not be supposed that the founder of a religious charity intended the trustee whom he selected to administer his charity should be called to account in the legal tribunals for a misapplication of the funds to the support of religious opinions different from those intended, unless he has used appropriate and explicit terms, excluding the doctrines to which the fund has been applied.

When the terms used in the instrument creating the trust are broad enough, in the most extended sense that can be given to them upon the common principles of interpretation, to include the religious opinions in question, it will be inferred that the intention was to leave it in the discretion of the trustee to apply the fund for the support of those opinions. If the donor intended to insist on a more limited application of his charity, it will be supposed that he would not have left his intention to be gathered by a narrowed construction of general and doubtful terms on an appeal to courts of law; especially if there were other appropriate terms in common use, by which his intention might have been placed beyond doubt or cavil.

This rule for construing the language used by the founder of a religious charity to designate the doctrines to be supported, is recognized in numerous cases, and, so far as I am informed, denied in none. It was laid down by *Walworth*, Chancellor, in *Miller* v. *Gable*, 10 Paige 627; and *Gardner*, President, says in the same case, 2 Denio 548, I cordially agree with the chancellor in opinion that it must be a plain and palpable abuse of a trust which will induce a court of equity to interfere respecting a controversy growing out of a difference in religious and sectarian tenets." In *The Attorney-General* v. *The Meeting-house in Federal Street*, 3 Gray 58, the rule is thus stated by *Shaw*, C. J.: "An owner of property may dispose of it in trust to maintain and inculcate any doctrines of Christianity clearly and specially designated; but he must do it in terms so clear as to leave no doubt of his intention." The remarks of *Walworth*, Chancellor, in the *Baptist Church* v. *Witherell*, 3 Paige 296; of Lord *Eldon*, in *Attorney-General* v. *Pearson*, 3 Merivale 402, and of *Maule*, J., in his opinion given to the Lords, in *Shore* v. *Wilson*, 9 Cl. & Fin. 499, bear upon the same point.

The town of Dublin were intrusted by the will of Mr. Sprague with the management and appropriation of this charitable fund. The first application of the fund was made in 1820 to the support of religion in the First Congregational Society, by paying the annual income to Mr. Leonard, the minister of that society. From that time until the commencement of the present suit, the trustees, without objection from any quarter, applied the income in the same way. It is not stated in the bill, nor do we understand it to be maintained in argument, that since the first appropriation there has been any change in the religious opinions of the society, or of the ministers who received the income, which has afforded any new ground for the interference of the court. The position of the complainants is that the fund was originally misapplied,

and during all this time has continued to be misapplied, to the support of religious doctrines which the donor intended to exclude; and on such grounds the court are asked to interfere and disturb an application, made in the outset by the trustees whom the donor selected to take charge of his charity, and continued and acquiesced in for more than thirty-five years. No length of time can furnish a legal justification for the abuse of such a trust; but when a question arises as to the contemporaneous meaning of the terms used in an ancient instrument, early and long continued usage has a controlling weight; and in this case the burden rests on the complainants to show, in a clear and satisfactory way, that the religious opinions to the support of which the fund was thus early and continually applied by the original trustees, were intended by the donor to be excluded from the benefits of his charity.

Mr. Sprague's bequest is in the following terms : " I give to the town of Dublin the sum of five thousand dollars, to be kept at interest by said town forever, for the sole purpose of supporting the Christian religion in the Congregational Society, so called, in said town ; the interest thereof to be paid quarter-yearly to the minister of the Congregational persuasion, who shall be regularly ordained and statedly preach in said society."

The minister to whom the interest of the fund is payable must be of the " Congregational persuasion." Mr. Leonard and Mr. Bridge profess to be, and claim to be, ministers of that persuasion. For the present we will assume that they have been regularly ordained, according to the usages of that denomination. There is no complaint that they have not in succession regularly preached in the First Congregational Society. Are their religious opinions such as exclude them from that denomination, and deprive them of the right to receive the income of this fund, though otherwise qualified? This has been treated by the counsel and regarded by the court as the main question in the cause.

The Dublin Case.

In the first place, taking the terms, "minister of the Congregational persuasion," as they stand on the face of the will, without looking to surrounding circumstances, or considering extrinsic evidence to discover whether they were used by the testator in any unusual or peculiar sense: Were they broad enough, in their general and common acceptation, to include such opinions as are held by the defendants, Leonard and Bridge?

The case has obliged us to enter somewhat upon historical and theological inquiries, with which our habitual studies and pursuits have not made us familiar, and which we would have willingly avoided; inasmuch as, with our best diligence, and all the aid we have received from the laudable industry of the counsel on both sides, our investigations of a subject so difficult and so extensive as the history of religious opinions in New-England, must necessarily be far less thorough and satisfactory than we could have desired.

Witnesses have been examined, who say that they have made the doctrines and history of the Congregational denomination a particular study; and their opinions, derived from the study of books and treatises on the subject, have been offered, to show the general meaning of the terms, minister of the Congregational persuasion. I think such evidence is not competent. We are under obligation to these witnesses for the assistance they have given us, by referring to the authorities on which their opinions are founded. We have used their testimony this way as we should the citation of authorities by counsel; but the general meaning of the terms, Congregational minister, Congregational church, Congregational denomination, and Congregational persuasion, is not matter of fact, to be proved by the testimony of witnesses, but matter of law, to be determined by the court. They are not terms of art, used only in some particular trade or business, and understood by those only who are engaged in

that trade or business, but general terms, in common use by all people, to designate a well known denomination of Christians, whenever there is occasion to speak of them. The evidence is not offered to show that the terms are or were used by any particular religious sect or party in a peculiar sense, different from their general meaning; nor to show that they have a peculiar local meaning, confined to some particular district of country. The general meaning of the term, " minister of the Congregational persua- sion," used in the will, whether it is to be gathered from the history of former times, from common usage at this time, or the authority of books which treat upon the sub- ject, the court must take the responsibility of deciding as matter of law. No lawyer would think of asking for an issue to try the question as matter of fact.

The authorities appear to be quite decisive against the admissibility of such evidence. In the *Attorney-General* v. *Drummond*, 1 Connor & Lawson 264, *Sugden*, then Irish Chancellor, said he objected that in *Shrove* v. *Wilson* the court below had acted upon evidence to show in what sense Lady Hewley had used particular words and phrases; and then proceeds to say, " I shall admit, or, if not tendered, I shall seek myself, in the writings of the period, in his- torical records, acts of parliament, and writings of persons of different persuasions at the date of the deed, for all helps to tell me what was the meaning of the words used. In *Shrove* v. *Wilson*, 9 Cl. & Fin. 499, seven of the common law judges attended the House of Lords, and each gave his separate opinion. *Tyndal*, C. J., said, on this point, " The court has a right to inform itself, and is to aim, if possible, to learn what was the acknowledged and received sense and meaning which those expressions bore at the time Lady Hewley lived, and as near as may be at the time of the execution of the deed; and all extrinsic evidence calculated to throw light on the mean- ing of those words is clearly admissible. Of that descrip-

tion are public records and documents, throwing light upon the religious history of the times, the language of the statute books, and enactments relating to the state and condition of the church and the religious sects then known in England, contemporary history, contemporary treatises, and tracts upon the religious tenets held by the different religious sects, the works of men of acknowledged weight and eminence in their respective persuasions, and published and circulated at that period, and the early and contemporaneous application of the funds of the charity itself. But as the evidence which I have just described is evidence which must be presumed to be in the mind of the court or judge, it is evidence which they furnish to themselves by reading, research and reflection; not that which they receive from the mouth of witnesses; and on this account I think all the extrinsic evidence which was actually given in the cause, for the purpose of determining who were entitled, under the terms, ' godly preachers of Christ's holy gospel,' and the other expressions used in the deed, was clearly inadmissible." In this opinion the other six judges concurred, except, perhaps, Mr. Justice *Williams*, who said, in general terms, without any particular explanation of his views on this point, that he thought, for certain purposes, the Lords might consider all the evidence in the cause. Ld. *Campbell* appears to have been of the same opinion, who said, in *Drummond* v. *The Attorney-General*, that much incompetent evidence was admitted in Lady Hewley's case. To the same point are *Miller* v. *Gable*, 2 Denio 521, and *Kniskern* v. *The Churches of St. John and St. Peter*, 1 Sanf. Ch. 439.

We are of opinion that the general meaning of the terms used in this will, whether it depends on existing or former usage, must be determined by the court as matter of law, without aid from the testimony of witnesses to their opinions; and that, to ascertain the meaning, we may resort to history, and works and treatises of acknowl-

edged authority, which have been brought to our notice in the arguments of counsel, and by the testimony of witnesses, or which we have met with in the course of our own inquiries.

Looking, then, to the history of the denomination, what was the distinguishing principle with which Congregationalists *commenced* as a religious sect, and upon which they separated from other denominations ?

The term Congregationalist, as used to designate a religious sect, is not unknown in England ; but in England, as I understand it, Congregationalists and Independents are now, and always have been, one and the same denomination ; and the two terms are there used indifferently, to signify the same sect and the same system of ecclesiastical polity. And in this country there was not formerly, if there is at this day, any religious sect distinct from Congregationalists, known by the name of Independents. At the time of the first emigration to New-England the colonists were congregational and independent in their opinions, but I do not find that either of those terms had been then assumed as the common designation of a religious party. Soon afterward, however—certainly as early as 1640—the churches in New-England were denominated *Congregational,* and were never commonly known, so far as I can learn, by the name of Independents. On the other hand, the party in England which had agreed in religious views with the New-England colonists, about the same time began to be known by the name of Independents. It would seem that the Independents in England regarded the Congregationalists of this country as belonging to the same religious denomination with themselves. In 1645, Sir Henry Vane, who had resided in this country, and been Governor of Massachusetts, evidently considered the Independents in old England and the Congregationalists of this country as brethren of the same religious party. In a letter written that year to Governor Winthrop he

warns the people of Massachusetts against the proscriptive policy which they had adopted in religious matters, and expresses his apprehension that the example might be followed in England against their brethren there, by the Presbyterians, who were then in the ascendency.

The historical fact I take to be beyond question, that Congregationalists and Independents were in their origin the same religious sect; that they sprung in the commencement from the same source, and started with the same leading and distinguishing principle, to wit, that each church and congregation were independent of all others. It was upon this fundamental principle of church polity and discipline that Congregationalists separated from Presbyterians and Episcopalians, and formed themselves into a new and distinct denomination, and not on account of any difference in matters of faith and doctrine; for in doctrine they agreed substantially with other Protestants. They denied the authority of presbyteries and assemblies, of bishops and councils, and all other ecclesiastical judicatories and associations to dictate any uniform system of doctrine or discipline. They held that the Scriptures were the only standard and test of religious truth; that no church was bound by any general creed or confession of faith, which might be set forth as an exposition of the doctrines taught in the Scriptures; that it was the right and duty of each church and of each individual to resort directly to the Scriptures as the source of divine truth; that each church was at liberty to settle its own articles of belief, provided they were founded on the Scriptures, and acknowledged Christ as head and master.

The remarkable and often quoted passage from John Robinson's discourse, preached to the Plymouth colonists on their embarkation for the New World, may be supposed to set forth what was then the leading principle of the denomination, and shows that they did not then regard their religious opinions as fixed and unchangeable, but

looked for new developments of divine truth from the study of the Scriptures. And Robinson says elsewhere, that "any competent number of Christians, who witness a good profession, may covenant with each other, and become a Christian church; that no church has a right to control another with reference to its individual concerns, except in an advisory manner." In the first years of the settlement in this country, churches acted on this theory of entire independence in the churches. In 1629, Skelton was chosen and ordained pastor, and Higginson, teacher, by the church in Salem, without the aid or advice of any other church or minister. 1 Felt 114. So the church in Dedham, in 1639, asserted their right to ordain their own minister, unassisted by any council from other churches, and ordained him accordingly, after inquiring of Governor Winthrop whether a recent ordinance on the subject was intended to deprive the churches of that liberty. John Cotton, as late as 1640, said : "We have reason to thank God that we desire not to be accounted Catholics or Hierarchs, nor stand members of a diocesan, or provincial, or national church, but bear witness against them all; that he hath given us churches and *Congregational* assemblies, by his covenant, to worship him in all his holy ordinances; that he hath given us to look for no laws but his word; no rules nor forms of worship but such as he hath set down in his word; *no platform of doctrines,* but such as are held forth in the word of the prophets and apostles."

Thomas Hooker's book, entitled "A Survey of the Sum of Church Discipline," published in 1648, after his death, was written after the opinions of the colonists in this country had received considerable modifications; but still it recognizes the original Congregational principle of independence in the churches. According to that work, to be a member of one Congregational church did not make a man a member of any other church, or give him a right of fellowship with any other church; 1 Hooker

64; and one church had no power or jurisdiction over another. 1 Hooker 65. He says that "though there was a general agreement in church covenants in some things which they held in common, there were yet specific differences, which made a real difference between this church and that;" 1 Hooker 66; and that each church had a right to insist on these specific differences, and to exclude from membership for want of conformity in them. Ibid. That is to say, one church might differ from another in matters of faith, so important and substantial, in the opinion of those interested, as to exclude from fellowship, and there is no intimation that either church would be denied the rights and character, or the name of a Congregational church. He says: "The testimony of any church of Christ ought to be valued according to the worth of it, and received with all due respect as the spouse of Christ; yet because the churches may decline in regard of their practice, and walk at a greater breadth of liberty, either in respect of their actions or opinions, than others can, or indeed they should," &c., "each church hath her liberty to follow the light of the word and the rule thereof, which will not err, nor can deceive, rather than sit down with the allowance of men; but use their own search and care; and if, upon inquiry and observation, either they should appear scandalous in their lives, or erroneous in their judgment and opinions, and those dangerous and infectious, it is then left in the power of the church to require humiliation answerable to the offences, and an open renunciation of such errors, before they be received."

Without multiplying authorities to a point which I suppose to be too clear for dispute, it may be considered as well established, that, in the origin and outset of the Congregational denomination, every church and every individual had the right to look directly to the scriptures for the standard of religious truth; that no power was recognized, either in the civil government or in any ecclesias-

tical judicatory, of bishop, presbytery, council, synod or association, to decide what was true or what was substantial and essential in doctrine ; and that, consequently, the principles of the denomination allowed differences of religious opinion in matters which particular churches and the great body of the churches might consider as material and essential ; for each church had the right to choose and change its own standard of religious character and doctrine, for membership and fellowship, and there was no resort to any tribunal clothed with power to determine authoritatively any question of doctrine or discipline.

All Congregationalists were of course Protestants, for their fundamental principles were inconsistent with supremacy in a pope, or binding authority in councils and other ecclesiastical tribunals.

It appears to me, however, to be equally clear, as matter of history, that there was in fact a great general conformity in the doctrines held by the first colonists of New-England, and in particular that no churches or ministers were then Unitarian, Socinian, Arian or even Arminian ; that they were all, at least so far as their opinions were publicly avowed, Trinitarian, and such as would now be termed orthodox; that Unitarians were not then, nor for long afterward, known as a sect or religious party in the denomination.

Such were the principles with which Congregationalists started in the outset, and which distinguished them from other denominations, with whom they had no disagreement in matters of faith and doctrine ; principles which have always been and still are, as I understand, generally recognized theoretically as fundamental in the Congregational system. But not long after the settlement of New-England very considerable practical changes were introduced. The principle was still admitted of an inherent right in each church to decide on her own articles of faith. The power to enforce uniformity of religious opinion in

the denomination was generally if not universally disclaimed; but the name of Independents began early to be disliked and disavowed; the association of churches in fellowship became general, and by the concurrent action of the clergy, in associations and synods, and of the magistrates and general court, a great uniformity of religious opinion was practically enforced, especially in Massachusetts. This they did, not upon the ground that they had power to proscribe any religious opinion as heretical, but on the ground that opinions, inconsistent with the doctrines generally received, were dangerous to the civil community. Thus Roger Williams, in 1634, was expelled by order of the magistrates and deputies, "for broaching and divulging divers new and dangerous opinions against the authority of magistrates." 1 Palfrey's History 412. Wheelwright was adjudged by the court to be guilty of sedition and contempt of the court, in 1637, and thereupon expelled from the government. 1 Palfrey 478, 479. In neither of these cases was the order founded on an adjudication of any tribunal, civil or ecclesiastical, that the opinions condemned were erroneous in a religious point of view. They maintained that religious dissension and anarchy in their religious commonwealth were dangerous to the State; and Mr. Palfrey has, in his recently published volume on the history of New-England, what appears to me to be a very successful vindication of their policy in this respect.

The system of fellowships and associations among churches and ministers appears to have been unknown for some years after the first settlement of New-England, but began to come into use as early as 1631. It met with opposition at first, for the reason that it was supposed to be an infringement upon the Congregational liberty of the churches. Roger Williams, in 1631, inveighed against the practice, then beginning, of associations among neighboring clergymen, " as being what might grow in time to

---

The Dublin Case.

---

a presbytery or superintendency, to the prejudice of the churches' liberties." The ministers, however, at an early period united in associations; they assembled in councils and synods, and recommended, with all the authority of united opinion in a body of men who then had the real control in matters civil as well as religious, rules of discipline and articles of faith. They sought out and denounced existing errors of doctrine. The synod of 1637 defined and condemned eighty-two erroneous opinions, which were supposed to have made their way into Massachusetts. In 1648 the synod adopted the Cambridge Platform, which was also three years afterwards sanctioned by the approval of the civil authority; recommending a system of rules for polity and discipline, and the Assembly's Catechism for substance of doctrine. In form, the action of the synod was only advisory; they disclaimed the power of " office imposition," which would have been inconsistent with the fundamental theory of their denomination. But in a community where a man's general importance depended so much on his religious standing, to be denounced for heretical opinions, and put without the pale of regular and orderly churches, had all the practical effect of a legal religious proscription; and a general uniformity in the religious opinions professed was for a time practically enforced, without an avowed abandonment of the principle that each church and congregation were independent of all others, except so far as they might choose to listen to advice and admonition.

This system, however, of fellowships, associations, councils and synods, was not introduced without opposition and remonstrance, nor borne without a good deal of restlessness and impatience. Roger Williams resisted in the commencement. Vane, in the letter to Governor Winthrop which has been before mentioned, protested against the course pursued by the Congregationalists in New-England, stating his apprehension that their example

might be followed to extirpate their brethren—the Independents—in England. He says : " The exercise and troubles which God is pleased to lay upon these kingdoms, and the inhabitants in them, teaches us patience and forbearance one with another, in some measure, though there be a difference in our opinions ; which makes me hope that from the experience here it may be derived to yourselves ; lest, while the Congregational way with you is in its freedom and backed with power, it teach its oppugners here to extirpate and root it out from its own principles." It is also worthy of remark that the Cambridge Platform, though it is said to have been adopted without dissent by the synod, was not received elsewhere without serious opposition, and, having been referred to the clergy for explanation, was, after a delay of three years, approved in the General Court by a vote of only 26 to 14. Records of the second session of the General Court, held at Boston the 14th of October, 1651. I do not understand, however, that this opposition proceeded from any dissent to the general system of doctrines recommended in the Platform.

The time when the Platform was adopted was remarkably favorable for drawing the bonds of religious discipline more closely, and carrying out to the fullest extent the great design of founding a religious state in the New World. The royal party was then prostrate in England ; the colonists were in high favor with the ruling powers at home, and left at full liberty to pursue their scheme of founding a Christian commonwealth in New-England. From 1638, when the civil war began, by the Scotch invasion of England, to the Restoration, in 1660, may be regarded as the golden age of the New-England theocracy. Both before and after that time they were discountenanced and thwarted by the English government.

The position of the complainants is, I think, fully maintained, that in the early periods of New-England

history there was in fact a great degree of uniformity in the faith and doctrines of the churches, which was maintained, however, without professing to discard the fundamental and distinguishing principle of the Congregational denomination, that each church had the right to choose and change her own articles of belief; and I think it is equally well established that the common faith of the churches was then Trinitarian, and what would now be termed Orthodox. Still, there was much difference of opinion in certain matters, a good deal of religious controversy, and not a little of suppressed uneasiness and discontent. The free spirit of the denomination was ready to reässert itself, whenever the pressure to which it had temporarily yielded should be removed.

Before the close of the seventeenth century the theocratic character of the New-England governments had begun sensibly to decline. In 1692 an ordinance was passed in Massachusetts, which provided that "each respective gathered church in any town or place within the Province that shall at any time be in want of a minister, shall have power, according to the word of God, to choose their own minister; and the major part of such inhabitants as do usually attend on the public worship of God, and are by law qualified to vote in town affairs, concurring with the church, the person thus elected and approved shall be the minister." I have no historical information as to the motives which led to this enactment; but the law would seem to imply that the original independence of churches and congregations was supposed to have been infringed, and that the ordinance was intended to restore to them the rights which had been impaired by the action of associations, councils and synods. However that may be under this ordinance, it is said by *Shaw*, C. J., in *The Attorney-General* v. *The Meeting-house in Federal Street*, that the people composing a parish and religious society were under no restraint as to what denomination they should

assume, what modes of Christian faith they would embrace and inculcate, or what form of Protestant worship they would adopt and follow.

In 1815 Dr. Jedediah Morse made a report, as chairman of a committee raised by the General Association of Massachusetts Proper. In this report it is said that laxity in discipline, and a growing defect in the fellowship, union and coöperation of the churches and their pastors, had been gradually increasing for about half a century after the Platform of the New-England churches had been adopted at Cambridge. To remedy this growing evil Cotton Mather, in 1706, produced his plan of a " Consociation," which appears to have been approved by the Convention, but met with so much opposition that it never went into operation, but remained a mere proposal. Cotton Mather says himself, " there were some very considerable persons among the ministers as well as the laity, who thought the liberties of particular churches to be in danger of being limited and infringed, and in deference to these the proposals were never prosecuted beyond the bounds of mere proposals." About the year 1700, Mr. Higginson, then above ninety years of age, and Mr. Hubbard, also an aged minister, recorded their testimony to the order of the gospel in New-England. In that document they lamented the decay of discipline, and predicted that the apostasy would not stop there, but that the same spirit would dispose the next generation to more and more changes, even in doctrine. 1 Panoplist 454.

Early in the eighteenth century new doctrines began to insinuate themselves, and apprehensions appear to have been entertained that Arminian, Arian and Socinian doctrines might in the end obtain a foothold in Harvard College. The President, Increase Mather, in a commencement address, (the particular year is not stated in the Magnalia, where I find it,) laments that there is a natural tendency in fallen man to relapse into Pelagian, Socinian

and Arminian errors, which can never be so entirely rooted out that they will not be perpetually springing up, like noxious weeds, in the soil of our corrupt nature, "tanquam infelix lolium in fundo naturæ corruptæ." In the taste of the times he attacks Arminianism with an anagram, and exhorts the young gentlemen who were taking their first degree in the arts to do their utmost that not the slightest trace of Arminianism might ever be found in their college. Facessant igiter inceptores ut in nostra academia nec vola nec vestigium Arminianismi unquam inveniatur. 2 Magnalia 17, book 4.

Using the religious freedom of the times, and the liberty which the organization and inherent principles of the denomination allowed, many of the Congregational ministers and churches, under the names of moderate Calvinists and Arminians, had, before the middle of the eighteenth century, lapsed from the strictness of the ancient faith, and held opinions diverging more or less widely from the standard of orthodoxy in earlier times. Under the name of Arminians some are believed to have entertained opinions which went far beyond those of Arminius himself. Dr. Worcester, in a note to his second letter to Channing, says that men calling themselves Arminians embraced Pelagian and Socinian doctrines. Page 11. When Whitefield made his first visit to this country, about the year 1740, he found a large proportion of the Congregational ministers and churches, Arminian, or at least not strictly orthodox. He and those who followed him were called "new lights" and "a new school." His preaching and the labors of the elder Edwards appear in some measure to have restored the former state of religious opinion in the country.

I find no evidence that ministers and churches, who then held Arminian or other new doctrines, were, by any religious sect or party, denied the name and rights of Congregationalists. I am aware that Arminians are

understood to admit the doctrine of the Trinity, and some other—perhaps most—of the Calvinistic doctrines, which are denied by those who are now denominated Unitarians; but the peculiar doctrines of the Arminians were looked upon by our Puritan forefathers as radically and fatally erroneous, insomuch that some zealous Congregationalists denied that Arminians, including such men as Grotius, were to be reckoned among Protestant Christians. Thus Nathaniel Mather, as quoted by Lord *Cottenham* in *Drummond* v. *The Attorney-General*, says, "Grotius indeed does the same, and I learn that Arminians and Socinians do so too; but. I do not reckon him or them among Protestants." The historical fact that Arminians, though they had apostatized from the ancient faith into what was before regarded, by the general consent of the denomination, as substantial and fatal error, were yet recognized on all hands as Congregationalists, shows clearly that diversity of doctrine and change of doctrine were admitted within the pale of the denomination, even in matters then regarded as fundamental and essential.

There were acts and resolutions of synods and councils, which were .intended perhaps by their authors to introduce standards and tests of orthodoxy; but those attempts were attended with only temporary and partial success. The original and fundamental principle of the denomination allowed and enjoined the exercise of individual judgment in matters of religion. It was not only the right, it was the imperative duty, of every Congregationalist to change his religious opinions, whenever, by an honest study of the Scriptures, which were received as the only standard, new light was revealed to his mind, and his conscience dictated the change; and by no such change was it supposed that he forfeited his place and his right in the denomination. And though this free spirit of the denomination was at times repressed, it was never wholly subdued, and never willingly submitted to the restraint of

a uniform confession of faith or the control of any ecclesiastical judicatory.

Complaints have continued to be made of the inconvenience and embarrassment caused by this licence and want of order in the denomination. The Panoplist for July, 1812, had an article on the want of ecclesiastical tribunals for the trial of offending ministers, in which the writer says, that, in case of any moral delinquency, it was a deplorable fact "that there is no tribunal in our churches competent to try an offending minister without his consent;" and says further, "But the defect is still more apparent in the case of heresy. Here a minister is absolutely invulnerable." In 1814, as appears by the Panoplist for that year, the original manuscript of Cotton Mather's plan of a consociation was discovered and produced before the General Association of Massachusetts Proper. The Association referred it to a committee, of which Dr. Morse was chairman, to inquire and report "On the expediency of a recommendation of this body of the plan of discipline there proposed, either entire, or with alterations." At the next annual meeting, Dr. Morse, for the committee, made an elaborate report, referring to the state of the denomination at former periods, and explaining its condition at that time; showing that as early as the time when Cotton Mather made his proposals for a consociation, much laxity in discipline had already been introduced; that the Platform was never adequate to its general object; that it had long ceased to be a guide of discipline, and had gone out of use; that the state of the churches, for want of some remedy like that proposed, had been such for half a century as could not be viewed without deep solicitude and grief; that the principle of fellowship among the churches was overlooked and forgotten. Panoplist for 1815, vol. 7, p. 359.

In that report the committee say, "At present there is no uniform system of rules to govern the conduct of

churches. The Cambridge Platform, though an able and useful treatise, is not adopted and used as a manual of discipline in our churches. Indeed, though we should be the first to plead for the general soundness of the principles contained in the Platform, we doubt whether those principles are exhibited in so precise and particular a manner as the present state of things would require." " Whatever may be said in commendation of the Platform, it has long since ceased to be of general practical use. Its provisions are not carried into effect. By our churches at large it is not regarded as of any consideration." " In the present state of things, there is no method in which Congregational churches can exercise a Christian watch over each other. A church as well as an individual member may apostatize from the common faith, and fall into disorders wholly incompatible with the Christian character. If such be the fact with any church, can another church in fellowship be indifferent? But what shall they do?" " So distracted is the present state of our ecclesiastical affairs, and so vague and loose and weak the principle of union, that churches in our fellowship may go to the greatest length of apostasy without any inspection, and without losing that indefinite fellowship which they before enjoyed."

I have not learned what final action was taken on this report by the Association. The question appears to have been left pending before the churches and public; for in two subsequent numbers of the Panoplist, for November and December, 1815, there is a treatise on the subject, recommending and urging the adoption of the plan proposed by the committee. In this treatise the writer states the same general reasons for adopting the plan which are relied on in the report. He says: " The Fathers of New-England held four Provincial Synods in the course of half a century. They composed numerous and labored treatises upon the system which they established in the coun-

try. But with deep concern they saw the subsequent generations less solicitous on the subject, and inclined to relax their strictness, and to admit innovations with little consideration and little regard to system. The influx of foreigners of various sentiments, the decay of vital piety in the land, and, above all, the relaxation of primitive strictness with regard to the admission of persons to the special ordinances, prostrated the energy of discipline, bred dissensions and controversies, and produced a general and growing departure from the first principles of New-England. Frequent attempts were made at reformation ; new provisions and remedies were devised, with only temporary and partial success." " In process of time the platforms and treatises of the fathers were forgotten ; no system was studied, none was acknowledged to be of authority, none was followed. Disorders of course ensued, vital piety languished, discipline became almost impossible, and, to prevent worse disorders than it was intended to heal, was at length nearly laid aside."

This revival of Cotton Mather's scheme of a consociation, to be a standing council, with power to investigate and decide questions of discipline and doctrine, met with opposition, as is said by the last mentioned writer in the Panoplist, " from some among the Orthodox, who were practical Independents and Brownists, and dreaded any coalition which would not comport with their favorite independency." It was charged by Unitarians that the real design of the plan was to introduce a system of conformity, which would drive all dissentients from the Congregational connection, and deprive Congregational churches of their natural rights. Dr. Channing, in his remarks on Dr. Worcester's second letter, says that Dr. Worcester's object seemed to be to prepare the Orthodox for a separation from their Unitarian brethren, and, among other things, break up the General Convention of Congregational ministers ; and in reference to this proposed plan

of a consociation he says: "It is a melancholy fact that our long established Congregational form of church government is menaced, and tribunals, unknown to our churches, and unknown, as we believe, to the Scriptures, are to be introduced, and introduced for the very purpose that the supposed errors and mistakes of ministers and private Christians may be tried and punished as crimes."

Those who recommended this scheme of a consociation defended it against such objections, by denying that its operation would be to infringe upon the Congregational liberty of the churches; because, they said, by the fundamental principles of the Congregational system, a church could not be deprived of its character as a Congregational church, or laid under any ecclesiastical disability to enjoy gospel privileges, inasmuch as "each church, upon Congregational principles, is sufficient of itself to maintain worship and discipline, and to observe all gospel ordinances." "This," says the above mentioned writer in the Panoplist, "is an important advantage of the Congregational system. It entirely shields all churches from all danger of ecclesiastical domination." "There is no reason to fear that the rights and privileges of individual churches will be wrested from them by any ecclesiastical combination which can be formed. Without their consent or allowance, no ecclesiastical power without can prostrate their internal discipline, or deprive them of the special and other Christian ordinances, or force them to do anything more than refrain from communion with such churches as will not commune with them."

Dr. Worcester, in a note to his third letter to Dr. Channing, gives an emphatic and indignant denial to the charge made by Dr. Channing and the "Layman," that the design of the consociation was to deprive Unitarians of their place in the Congregational denomination, or trench upon their rights as Congregationalists.

These answers, made to the charge that the scheme
was intended to interfere with the rights of Unitarians as
Congregationalists, would seem to go upon a clear conces-
sion that Unitarians were interested in the question as
Congregationalists, and that the doctrines which they held
did not exclude them from the denomination.   The ortho-
dox advocates of the system did not say, " This is a plan
to regulate the discipline of Congregational churches and
ministers, in which you have no concern ; for you are
Unitarians, and therefore not Congregationalists."   They
took no such ground, but said, " Your rights are safe ;
our plan has no such design as you impute to it.   All we
propose is to provide some uniform and effectual way of
inquiring into the character and principles of ministers
and churches, in order that there may be a safe and con-
venient mode of exercising the old and undoubted Congre-
gational right of giving and withholding fellowship, as
each church and minister may choose."   Orthodox churches
and ministers had already the unquestioned right to with-
hold fellowship from Unitarians ; and if it should be
denied, under the proposed system of a consociation, the
argument was that the denial would have no other or
higher effect than it had before, and would still leave
Unitarians within the pale of the Congregational de-
nomination, with all the powers and rights of Congre-
gational churches.   I have been informed that this plan
of a consociation was extended so as to include Con-
gregational churches in all the New-England States,
and was referred to a committee of gentlemen from
different States, of whom Dr. Beecher, then of Con-
necticut, and Dr. Church, of Pelham, in this State,
were members ; that the committee, after conferring on
the subject, were not able to agree on any new plan
which they were willing to recommend for adoption ; that
the project continued to be agitated till 1826, when it was
dropped for the time.   The question was, however, revived

in 1844, and Messrs. Woods, Humphrey, Snell, Shepherd, Cooley, Storrs and Cooke, appointed as a committee, "to take into consideration what measures are necessary to be taken for the affirmance and maintenance of the principles and spirit of Congregationalism." Dr. Woods, for the committee, made a report the next year, submitting a plan, but I do not understand that the plan has ever been adopted. In that report the committee say: "We have referred to the want of the necessary harmony among Congregationalists. They do indeed profess in some sort to receive the Cambridge Platform as their standard, but the Platform is in some respects understood differently by different ministers and churches, and none of them conform to all its provisions. Various writers, particularly Upham, Mitchel, Punchard, and some others, have published books of great value, setting forth what they understood to be the principles of Congregationalism. In most cases these writers agree, in some they differ; but Congregationalists have not adopted the views of either."

All this action and agitation on the subject appears to go upon an admission that there is not, and at least for the last fifty years has not been, any recognized standard, either of discipline or of doctrine, in the Congregational denomination.

The history of the denomination shows, I think, that the original and distinguishing principles of the Congregational denomination allowed differences and diversities of doctrine within the pale of the denomination; that each church had the right to choose and change her articles of faith; that though the denomination in this country disclaimed the name of Independents, and in the early history of New-England a great degree of uniformity was practically enforced, yet the original principles of the denomination were at all times admitted in theory; that ministers and churches, for a long time before 1817, had used this Congregational liberty, and a considerable num-

ber of them had departed from the faith of the fathers, and become Unitarian, and still, by common consent, retained their place and their rights in the denomination.

These new doctrines had come in for the most part silently, and spread gradually. There was no new organization of churches and societies; the new opinions were engrafted on the old system. Mr. Ellis, in his book, entitled Half Century of the Unitarian Controversy, fixes on the year 1805, when Professor Ware was appointed to the Divinity-chair at Cambridge, as the date when Unitarians became a known and recognized religious party in this country. I understand that Unitarian opinions had been previously entertained and inculcated at Cambridge; but it was then that the oldest and leading institution of learning in New-England, which had been the great centre and source of Congregational opinion, and the principal nursery of Congregational ministers, passed publicly into the control of Unitarians. The controversy then assumed a popular character. About that time periodical organs of the two parties were established, and have ever since been maintained. The Anthology was begun in November, 1803, which, though partly of a literary character, represented the religious views of the Unitarians. Then came, on the same side, the Christian Monitor, the General Repository in 1812, and the Christian Disciple in 1813. The Panoplist was commenced on the orthodox side, in 1805. The Panoplist in 1810 speaks thus of the Unitarian publications at that time: "The Anthology, the Christian Monitor, the Improved Version of the New-Testament, the Additional Hymns and Mangled Psalms, with many other publications of like nature," &c., "sent into various parts of New-England." "The Unitarians of New-England appear to pursue, in many respects, the path marked out by the celebrated Dr. Taylor, of Norwich, towards the beginning of the last century." "The present year has produced more Unitarian publications in

the United States than the whole antecedent period ;" and the Panoplist, for 1816, says : " The Anthology sunk under its own sins, and the Repository rose as its successor." The same journal, as early as 1806, holds the following language : " Should it please the exalted Redeemer to address the churches in New-England, especially in this commonwealth, we have reason to conclude his language could not be unlike that which he addressed to the churches in Asia. He would certainly find as little to approve and as much to condemn as he found there ; not a single erroneous opinion or practice existed among them which does not in substance exist here." And in an article found 2 Panoplist 16, entitled, " Survey of the Churches," it is said that such errors of opinion " could not obtain such currency, and be avowed with such boldness, and defended with such success, without the concurring agency of large numbers."

The slightest examination of the contemporaneous religious publications will show beyond all question that even previous to 1815 there was a very considerable party in the Congregational denomination who were well understood to hold Unitarian opinions ; that even then it was by no means a dormant and concealed party, though not so sharply defined as it became in 1815.

And these religious publications of the time show another fact ; that the two religious parties had, before 1815, become generally and popularly known by the same distinguishing names which they have ever since borne. The old and Trinitarian party were called Orthodox, and this designation was conceded to them by the Unitarians. They also claimed the name of " evangelical," which I do not understand that Unitarians yield to the Orthodox as a distinctive appellation. The Unitarian party were generally called and known as Unitarians, and they termed themselves " liberal Christians." It would be too tedious to cite examples to show that these terms were then in

common use as they are now. It is entirely clear that, for several years before 1817, in the religious periodicals and other publications of the time, the same terms were familiarly used to designate the opposite religious parties and opinions that are used now.

Before 1805 there appear to have been some known and avowed Unitarians in New-England, and there is reason to believe there were many more whose opinions, if not industriously concealed, were not openly and formally expressed. As early as 1760, Bellamy, the distinguished clergyman of Connecticut, published an article in the Connecticut Gazette, signed Paulinus, in answer to a communication in the same paper subscribed "Scripturista." In that article Bellamy insists that heretical opinions were making an alarming progress in the country; were getting a foothold in Connecticut; were openly avowed in Boston, and says further: "In New-Hampshire Province this party have actually three years ago ventured to new model our Shorter Catechism, to alter or entirely leave out the doctrines of the Trinity, of the decrees, of our first parents' fall, of original sin, Christ's satisfying divine justice, effectual calling, justification, adoption, sanctification, assurance of God's love, perseverance in grace, &c., and to adjust the whole to Dr. Taylor's scheme; and in their preface to this new catechism they tell the world that the snarling of bigots will be little regarded." I have not been able to learn who published the mutilated catechism in New-Hampshire, or how far it was circulated and adopted. Since it is now so entirely forgotten, it is fair to infer that the movement had no considerable or permanent success.

The fact we think is well established, that in 1817 a considerable proportion of the churches and ministers in the Congregational order and denomination were Unitarians, claiming to be Congregationalists, and generally recognized as such by the Orthodox division of the denom

ination.   The exact proportion it is not possible nor ma-
terial to ascertain.   If they constituted a part of the reli-
gious denomination known by the name of Congregation-
alists, it can make no difference in the construction of
the will whether they amounted to a third or a sixth part
of the whole number.   The statistical fact must be con-
ceded to the complainants, that a decided majority of the
denomination were then and are now Trinitarian, and
that the prevailing opinions in the denomination have
always been such.

It is said in argument, that, though Unitarian opinions
may have existed in the Congregational denomination
at the time when this will was made, the doctrine was
then dormant and concealed, and therefore the testator,
when he used the terms, Congregational persuasion, could
not have intended that his charity should be applied to
the support of doctrines which he cannot be supposed to
have known had any existence in the denomination.

The Unitarians had existed in New-England, as an
avowed and recognized religious party, and the Unitarian
controversy had been going on, from as early a date as 1815.
An account of Unitarianism in New-England, extracted
from Belsham's Life of Lindsay, had been published in
this country, which undertook to state the progress those
opinions had made, to name individuals who embraced
them, and set forth the doctrines of the sect in much
wider divergence from the Orthodox standard than most
Unitarians were willing to admit that they held.   In the
June number of the Panoplist for 1815 was a review of
Belsham's Work, understood to be from the pen of Dr.
Morse, and in the course of that year the whole of the cele-
brated controversy between Dr. Channing and Dr. Worces-
ter was published.   A very animated, not to say heated and
acrimonious controversy was carried on in that and the
succeeding years, in the religious periodicals and other
religious publications, to which the attention of the whole

religious public was directed throughout New-England. This we take to be an unquestionable fact. However it may have been in earlier times, we find no foundation for the position that in 1817 the Unitarian doctrines, the Unitarian party, or the Unitarian controversy were private and concealed in New-England, so that they could have been overlooked by any intelligent religious person, especially by a Congregational clergyman, when he was using a term in his will, that in common acceptation might include Unitarians as well as Trinitarians.

It is said that in New-Hampshire the number of Unitarians has always been small, and that in 1817 there were very few avowed Unitarians in the State, and that, therefore, Unitarians are not entitled, as Congregationalists, under the will; or, in other words, it is contended that the terms, Congregational persuasion, used by a resident of New-Hampshire in establishing a charity in this State, must have a different meaning from that which would belong to the same terms, when used where Unitarians are more numerous in the denomination.

But Congregationalists are not a local denomination, whose principles or system in any way depend on State lines. The counsel for the complainants as well as for the defendants have very properly resorted to the history of the denomination in other States, for their authorities in regard to the principles, the doctrines, and the acts and proceedings of Congregationalists, in order to ascertain the meaning of the terms, Congregational persuasion, used in this will. Ministers and churches of different States have always acted together, as I understand it, in the ordination of ministers, and other ecclesiastical proceedings, whenever local convenience allowed it. At the ordination of Mr. Sprague himself, Dr. Langdon, then President of Harvard College, preached the sermon, which I have seen in print. I understand that only two of the clergymen who were called to the council on that occasion were of this State,

and the others were from Massachusetts. The Panoplist was the general periodical organ of the Orthodox party in 1817, and its proportionate circulation probably as large in New-Hampshire as in Massachusetts. The General Association of New-Hampshire, when they wished to address the religious public in this State, published their proceedings in the Panoplist, and that Association was usually, if not always, represented by delegates in the Massachusetts Association. The Congregational system is, I think, the same, the Congregational denomination the same, and the general meaning of the terms, " Congregational persuasion," the same in New-Hampshire as in Massachusetts.

Nor do we find any reason to believe that in 1817 the attention of Congregationalists was less generally called to the Unitarian schism, or the Unitarian controversy, in New-Hampshire than in Massachusetts. Previous to 1811 — how long before I am not able to say — Noah Worcester, a Congregational minister, settled at Thornton, N. H., published the "Bible News," which appears to have been extensively circulated in this State and abroad. Dr. Channing, in 1815, spoke of it as a well known book, and said that its doctrines agreed with those held by the great body of Unitarians. I have looked into the book, and, so far as a layman may be allowed to judge of such a question, I cannot perceive that the opinions of the author differ substantially from those professed by the defendants, Leonard and Bridge. They are unquestionably Unitarian, and were so regarded at the time. In 1811 the state of opinion in New-Hampshire on the doctrine of the Trinity was thought to be such as called upon the General Association of Congregational Ministers to issue an address on the subject; and at the meeting of the Association, held at Dunbarton, in September, 1811, an address was reported by a committee appointed for that purpose, entitled, " An Address to the Churches in con-

nection with the General Association of New-Hampshire, on the subject of the Trinity;" which was adopted by the Association, and published in the Panoplist for November of that year. The address vindicates the doctrine of the Trinity, represents that time as one of abounding iniquity, and speaks of prevailing errors in the following terms : " When errors or damnable heresies are disseminated, we should see that our hearts are established with grace, so that we are not tossed to and fro, and carried about with every wind of doctrine." I understand that this address on the Trinity was suggested, at least in part, by the Bible News, and the progress which it was apprehended the doctrines of that book had made or were making among Congregationalists in New-Hampshire. It is worthy of remark that the Panoplist was selected as the publication most likely to communicate this address to the Congregationalists of New-Hampshire ; and that publication, from its first establishment, was full of the Unitarian controversy ; which shows that all intelligent religious people, especially all Congregational clergymen, in New-Hampshire, must have been well informed of all that related to this subject. We have no information which leads to the conclusion that there was anything in the state of religious parties or of religious intelligence to give the terms, " Congregational persuasion," any local meaning peculiar to New-Hampshire. We think the words have the same meaning as they would have, if they had been used by a Congregational clergyman in Massachusetts to establish a charity in that commonwealth.

Neither do we find the slightest ground for the position that the word " Congregational" has or had any peculiar and conventional sense, different from the general meaning, in the usage of any particular sect or party ; as is perhaps the case with the word " evangelical," as used by Trinitarians, and the term " liberal," in the phraseology of Unitarians. When the Orthodox party speak of evan-

gelical ministers or churches, I understand they mean
Orthodox ministers and churches, and exclude Unitarians;
whereas Unitarians do not use the word in that restricted
sense; and if the fund had been given to support "evan-
gelical" doctrines, it might be competent to show that
the donor belonged to a religious sect that used the term
in a peculiar and limited sense.   But we understand that
the word Congregational is the general term in common
use to designate a religious denomination, and is not used
by the Orthodox in any peculiar sense, but means the
same thing when used by Orthodox and Unitarians.
When the Orthodox mean to distinguish their own doc-
trines from those of Unitarians, they have other and
appropriate terms, such as Trinitarian, Orthodox or Evan-
gelical.

We must consider the following positions as established:
There has been, since 1817, no change in the state of reli-
gious opinions or parties which can affect the construction
of this will; the term, "minister of the Congregational
persuasion," had not, in 1817, any local meaning peculiar
to New-Hampshire; the term was not then used by any
particular religious party or sect in any peculiar, or con-
ventional sense, different from the general, popular, and
theological meaning, and therefore the general explana-
tions and definitions of the terms found in books of
acknowledged credit are authorities to show the meaning
of the term as used in the will.

In Webster's Dictionary, Congregationalism is defined
to be, "that system of church government which vests
all ecclesiastical power in the assembled brotherhood of
each local church as an independent body," and a Congre-
gationalist as "one who holds to the independence of
each congregation or church of Christians, and the right
of the assembled brethren to elect their own pastors and
determine all ecclesiastical matters."   He cites "J. Mur-
dock" as his authority for these definitions.   Worcester

defines Congregationalism to be, " That mode of church government which maintains the independence of separate churches," and a Congregationalist to be " one who adheres to Congregationalism." These definitions do not undertake to set forth the religious opinions of the denominations; but they show that the terms are not appropriately used to designate any system of doctrines. Bellamy, 1 Works 559, says, " We all lay down, as a first principle and fundamental maxim, that not creeds or confessions, but the Scriptures of the Old and New Testament are the only rule of faith, by which we are, each one for himself, to be determined what to believe in matters of religion." In Adams' Dictionary of All Religions, 60, Congregationalists are said " to be a denomination of Protestants, who maintain that each particular church has authority from Christ for exercising church government, and enjoying the ordinances of worship within itself;" and in a note to the same book it is said, " they are divided into Calvinists of the old school, a large number of Hopkinsians, Arminians, Unitarians of different grades," &c.

The Encyclopedia of Religious Knowledge—a work which has been copiously cited by the counsel on both sides—Article Congregationalism, has the following: " Congregationalists are a class of Protestants who hold that each congregation of Christians, meeting in one place, and uniting by a solemn covenant, is a complete church, with Christ for its only head, and deriving from him the right to choose its own officers, to observe the sacrament, to have public worship, and to discipline its own members." " The Bible is the only standard by which to test heresy; the churches are not bound by any one creed, but each church makes its own, and alters it at pleasure;" " all that synods and churches have done has been to set forth the prevailing belief of the churches at the time when they were held." In Benedict's History of Religions, Ed. of 1824, p. 193, cited by the counsel for the

defendants, it is said, "the Convention of Congregational Ministers embraces all members of the *Congregational persuasion*, whatever their theological opinions may be. A large proportion of them are Unitarians, and otherwise anti-Orthodox."

It has been contended in argument that the term *persuasion* is more proper to indicate doctrines than the term denomination, and that the terms, "minister of the Congregational persuasion," must be held to designate the prevailing doctrines of the denomination, though the term minister of the Congregational *denomination* might not have that sense. But it will be observed that Benedict, in the passage above quoted, uses the word *persuasion* in the same sense as *denomination*, and includes Unitarians under the term, "ministers of the Congregational persuasion;" and I think it would be strange to hold that any man was a minister of the Congregational denomination, who was not of the Congregational persuasion. When taken separately and independently there is no doubt a difference in the meaning of the two words; but used in connection with the denominational name of a religious sect, to designate that sect, the two terms must mean the same thing. If the complainants had established their position that the denomination has a creed implied in the term Congregational, then the term, "minister of the Congregational denomination," must necessarily mean one who holds to that creed; but if they fail to show this, then the word "persuasion" cannot refer to any creed of the denomination, for none belongs to it, but it must refer to what distinguishes the denomination, that is, to their belief in matters of polity and discipline. And I cannot regard it as a sufficient answer to this view of the question to say that certain doctrines were the prevailing belief of the denomination; in other words, that the majority of the denomination held to those doctrines; for if the minority were in the denomination, they were as much mem-

bers of it, and as much embraced within the term Congregational, as the majority. A generic term includes equally all the species, though one species may outnumber another one hundred fold. White swans are supposed to be more numerous than black; but the word swan would include the black, if any should be found, as well as the white.

It is to be observed that in the only instance brought to our notice in which the term "Congregational persuasion" has been used, it has manifestly the same meaning as "Congregational denomination," and includes Unitarians as well as Trinitarians. If the testator understood that the term Congregational denomination would embrace Unitarians, and intended to exclude them, there were other and appropriate terms which he certainly would have used, instead of relying on a distinction so minute and shadowy as this between Congregational persuasion and Congregational denomination. I think that ministers of the Congregational denomination are ministers of the Congregational persuasion, and that the terms must have the same construction in this will. The difference between them is much too slight to be made the foundation of a legal decision.

The history of the constitution, the proceedings and the present condition of the General Convention of Congregational ministers in Massachusetts would seem to have an important bearing on the question whether Unitarians are included in the denomination, and entitled as beneficiaries of a charity established for the aid of Congregationalists. The origin of that association dates as far back as 1680, when Unitarians were not known as a religious sect in the country. It embraced all Congregational ministers in Massachusetts. A large charitable fund had accumulated, to be administered for the benefit of the widows and orphan children of Congregational ministers. None but widows and children of Congregational ministers were entitled as

beneficiaries. A decided majority of the Convention are, and always have been, orthodox. In 1820 a committee, consisting of Drs. Porter, Pierce, Holmes and Codman were appointed by the Convention, who made a report on the history and constitution of the Convention, and recommended rules for governing the proceedings, and defining who were members. The second rule, found at page 27 of the printed report, is in these terms: "Every ordained Congregational minister, having the care of a particular church in this commonwealth, shall be a member of this convention."

Neither before nor since the adoption of this explanatory rule has the right of Unitarian ministers to be members of the Convention, so far as I can learn, been denied or questioned. They do not meet for purposes of Christian fellowship; they differ widely in faith and doctrine; but notwithstanding this want of fellowship, and this radical difference in their religious opinions, they are all received with equal rights as ministers of the Congregational denomination. The same question arose there which arises in this cause, to wit, whether Unitarians are entitled to the benefits of a charitable fund which has been given to aid ministers of the Congregational denomination; or, in other words, whether the terms, ministers of the Congregational denomination, will exclude Unitarians. The members of that Convention must be supposed to have understood as well as any other body of men what was the true meaning of the term, Congregational minister. Yet they admit, and always have admitted, Unitarians to equal rights in the Convention. The officers and anniversary preachers have sometimes been Orthodox and sometimes Unitarian. I observe, by the published proceedings of the present year, that Dr. Lothrop, of Boston, has been reëlected treasurer, and Mr. Morrison, of Milton, chosen for the next preacher. This action of the Congregational Convention must be regarded as very decisive evidence

that in Massachusetts the term Congregational ministers includes Unitarians and Trinitarians indifferently.

The same thing is shown by the election of Unitarians to offices in Harvard College, which are required to be filled by Congregational ministers.

There is another consideration which we cannot but regard as of controlling weight in this cause. When a question arises upon the construction of doubtful terms used in an old instrument, it is a safe guide to follow the interpretation which has been put upon them by early and long continued usage, especially where the subject is of a public nature, in which large numbers are interested. This general rule is too well established and too familiar to need the citation of authorities, and has been applied in all its force to cases like the present. Thus in the *Attorney-General* v. *Drummond,* 1 Drury & Warren 368, *Sugden,* then Irish Chancellor, says, " One of the settled rules of law for the construction of ambiguities in written instruments is, that you may resort to contemporaneous usage to ascertain the meaning of the deed. Tell me what was done under such a deed, and I will tell you what that deed means." In *Shore* v. *Wilson,* 9 Cl. & Fin. 399, *Tindal,* C. J., said he should look to the early and contemporaneous application of the fund, to ascertain the meaning of Lady Hewley's deed. In *Cambridge* v. *Lexington,* 17 Pick. 230, Chief Justice *Shaw,* speaking of this rule, says, " Much of the security of property and the peace of society is founded on a steady adhesion to this salutary rule."

I find nothing in the case that gives the smallest countenance to the position that Mr. Leonard's opinions were concealed and suppressed when he was settled, in 1820. They were as well understood then as they ever have been at any time since. Dr. Ware, the Unitarian professor of divinity at Cambridge, preached the ordination sermon. Dr. Barstow, the venerable and distinguished Orthodox

clergyman of Keene, who was called to the council, found Mr. Leonard's opinions decidedly Unitarian, and refused to assist in his ordination. Mr. Newell, a neighboring clergyman, excluded him from his pulpit on account of his opinions. There has been no change since in the opinions of the ministers who have preached in the First Congregational Society. Yet the townsmen of Mr. Sprague, whom he appointed as trustees to administer this charity, made the first application of it to the support of a minister well known to be a Unitarian, and the same application was continued, without objection, so far as appears in the case, for more than thirty-five years. In the year 1817, in the State of New-Hampshire, and in the town of Dublin, did the terms, minister of the "Congregational persuasion," in their common acceptation, include, or exclude, a minister holding opinions like those of Mr. Leonard and Mr. Bridge? The fact that so soon after the will was made, and as soon as any minister was settled in the society, the people of that town, acting as trustees, applied the fund, and for thirty-five years continued to apply it, without objection, to the support of such a minister, is very strong to show that then and in that part of the country the terms used in the will were commonly understood to embrace Unitarians holding opinions such as are held by Mr. Leonard and Mr. Bridge. A very strong case ought to be made out by the complainants before the court would be authorized, upon any principle recognized in the law, to interfere and disturb the application of a public charity made so early, and so long continued and acquiesced in.

There is another fact, testified to in the case, of some significance, to show the local and contemporaneous meaning of the word Congregational. When the seceders from the First Congregational Society first associated under the statute, they assumed the name of the "*Second* Congregational Society in Dublin," which they afterward, on

a reorganization in 1837, changed to their present corporate name.

Upon the best consideration which we have been able to give the case, we have been brought to the following conclusions :

That the word " Congregational," as used to designate a religious sect, was not in the outset appropriately used to describe a system of theological opinions, but the ecclesiastical polity of the denomination :

That the original theory and fundamental principle which distinguished Congregationalists, when they separated from other denominations, was the right which they claimed for each church and congregation to choose their own officers and teachers, to regulate their own affairs in matters of discipline, and to choose and change their own articles of faith at pleasure, always acknowledging Christ as their head and master, and the Scriptures as the standard of divine truth :

That the theory and original principles of the denomination admitted diversities of opinion in matters of faith and doctrine, which might be regarded by the majority and great body of the churches as substantial and essential ; that there was no ecclesiastical judicatory recognized in the denomination, clothed with power to decide on questions of doctrine, but only to recommend and advise :

That notwithstanding these theoretical principles of the denomination, there was a period in the early history of New-England when uniformity in the profession of religious opinions was practically enforced with much strictness, without, however, denying the theoretic right of congregations and churches to choose their own articles of belief:

That during this period, and for long afterwards, there was in the denomination a prevailing system of doctrines, which might well be called the common faith; that this system was Trinitarian, and such as would now be termed

orthodox; that for a century or more after the first settle-
ment of the country, there were no avowed Unitarian,
Socinian, or Arian churches or ministers in the Congrega-
tional denomination :

That a gradual defection from the ancient faith com-
menced early in the eighteenth century; that the new
opinions were introduced without any change in the organ-
ization of churches or congregations ; that notwithstand-
ing these changes in doctrine, churches and ministers were
still recognized as Congregational, and, by common con-
sent, retained their place in the denomination :

That at length, in the beginning of the present century,
there became two recognized parties in the denomination,
distinguished by appropriate names ; one holding more or
less strictly to the old opinions, and called Calvinistic,
orthodox, Trinitarian, or evangelical; the other, diverg-
ing more or less widely from the ancient faith, and denom-
inated Unitarian, or liberal; that these two divisions now
exist within the Congregational denomination, using the
Congregational system of polity and discipline, acknowl-
edging the Congregational principle that each church and·
congregation have the right to settle their own creed,
according to their conscientious interpretation of the
Scriptures, and distinguished by the same appropriate
names :

That, interpreting the words used in the will according
to the general meaning which they have now, and had in
1817, the terms, "minister of the Congregational persua-
sion," would be broad enough to embrace Unitarians and
Trinitarians indifferently; and therefore, if the donor in-
tended to limit the benefits of his gift to one division of
the Congregational denomination, the court will infer that
he would have adopted some one of the appropriate terms
in common use to designate the division intended, instead
of employing language extensive enough to include both,
and would have said that the minister of the Congrega-

tional persuasion, who received this bounty, must be ortho-dox, or Trinitarian, or evangelical, in his religious opinions:

That the construction of the will must depend on the meaning which the language had at the time when the will was made. If at an earlier day the terms were used in a sense which had then become obsolete, or have acquired a new meaning since, the court must endeavor to ascertain their contemporaneous meaning, and be governed by that; that the ancient faith of the denomination is no otherwise important than as it may assist to show what opinions were held in it at that time, and what was the sense in which the terms were then used; the question being, not whether Unitarians are apostates from the old doctrines, but whether, at the time when the will was made, they had a place in the Congregational denomination, and were included in the meaning of that term:

That there was in 1817 a well known party in the Congregational denomination which held Unitarian opinions; that the relative proportion of members, if it has changed at all since that time, has not changed to an extent which can affect the construction of this will; that Unitarians in 1817 were not a concealed and dormant party, which the donor can be supposed to have overlooked, if he intended his charity should be limited to the support of Trinitarian opinions; that the controversy between the two sects attracted as much public attention and was carried on with at least as much heat and zeal in 1817 as at the present time; and that there has been no change in the general use of the terms, " Congregational persuasion," which has given them a more comprehensive meaning than they had when the will was made:

That the terms had no local meaning confined to New-Hampshire; the term, " Congregational," as applied to a religious denomination, having the same meaning throughout New-England:

That the terms were not used in any peculiar and conventional sense by any particular religious sect; but were the common and popular terms, used alike by all sects to designate the same denomination.

There is nothing in the context of the will to control the general meaning of these terms.

Being of opinion that the terms, minister of the Congregational persuasion, used in the written instrument which established this charity, had at the time a known, intelligible meaning, applicable to the subject matter of the gift, without the aid of extrinsic evidence; that those terms were broad enough to include religious opinions such as are held by the defendants, Leonard and Bridge; that there is nothing in the case to show that they were used in any local or sectarian sense, different from their general meaning; the legal question remains whether evidence of the religious opinions of the donor can be received to control and limit the meaning of the terms which he used in his will, so that Unitarians shall be excluded and Trinitarians only entitled as beneficiaries.

It is said in argument, that the private opinions of Mr. Sprague are not competent, but that his public ministrations and instructions, which show him to have been in connection with the Congregational body, are competent, because he will be held to have used the terms in the sense in which they were used by the religious party to which he belonged. Admitting this legal position to be correct, it has not been shown, nor has there been any attempt to show, that the term "Congregational" was used by Congregationalists, or any division of the denomination, in any peculiar sense different from the common and generic meaning. It is not one of the terms, like "evangelical" or "liberal," which have acquired a peculiar and conventional meaning in the usage of a particular religious sect or party; and therefore this ground for a distinction between public and private acts and declarations of the

donor, fails on the facts of this case, and the question here is general, whether the individual opinions of the testator can be received as evidence to control the meaning of the language in which he has chosen to express his intention in the will.

If the correct definition of the word "Congregational" includes Unitarians and Trinitarians indifferently, the construction which the court must put upon them will be the same as if the testator had inserted the definition in his will, and said, "I give the fund to aid in the support of a minister of the Congregational persuasion; and provided he is of that persuasion, it is indifferent to me whether he belong to the Trinitarian or Unitarian division of the denomination." As in our opinion Trinitarians and Unitarians are embraced equally in the general meaning of the term Congregational, as used in the will, if the opinions of the donor can be admitted to contract and limit the meaning, and the court are to draw the legal conclusion that the minister must be of the same religious opinions with the donor, then, if the evidence should prove him to have been a Unitarian, Trinitarians would be excluded, and *vice versa*.

There is no such obscurity in the terms themselves as prevents the court from giving them effect without aid from the evidence offered; there is no latent ambiguity, arising from a doubt as to the object of the charity, as described in the will; for the terms, as we hold, embrace both systems of religious doctrine. The question is not to which of them the words relate, for they include both. There is no legal inconsistency in leaving the fund to be applied by the trustees to the support of either Unitarian or Trinitarian opinions, or of both. Following the language of the will in the construction which we give to it, it is left to the Congregational Society to determine the particular religious opinions of their minister within the limits of the Congregational denomination. The evidence

is offered, not to aid the court in giving effect to the language used in the will, but to change the meaning of the language; to limit and control it. The effect of the evidence would be to give the will a different meaning from that which the language implies, when left to be construed without such evidence. I have not been able to discover any legal ground upon which the evidence can be admitted.

There are, however, cases which give countenance to the opinion that such evidence is admissible; but I think it will be seen, on examination, that in none of them has such evidence been made the sole or principal foundation of the judgment; that the evidence has been received as auxiliary to the main ground of the decision, which would probably have been the same if the evidence had not been received. In no one of those cases do I find the court undertaking to draw the legal conclusion that the donor must have intended to limit the application of his charity to the support of his own religious opinions, though no mention was made of them in the instrument creating the trust. For instance, I find it no where held or intimated that, if a fund were given in trust for a denomination or congregation known to hold certain well defined religious opinions, and the fund had been appropriated contemporaneously by the original trustees to the support of those opinions in that denomination or congregation, it could be shown that the donor himself held to different doctrines, and the legal inference might thence be drawn that he could not have intended his charity should be applied to aid the denomination or congregation which he had designated in his will. The rule cannot be general and absolute, that the court will inquire into the opinions of the donor, and limit the application of his charity to the support of those opinions only. As I understand the cases, none of them go further than to admit the evidence where it was supposed that the intentions of the donor could not

be gathered by legal construction from the language used in the instrument which established the charity.

In the cases to which I have referred, the leading facts were materially different from those which appear here. In all of them the charities had been created in far distant times, and the funds had been diverted from the support of the religious opinions to which they had been contemporaneously appropriated by the original trustees. In the English cases, and in the Irish case, the new opinions were unlawful at the time of the gift, and the public profession of them punished as a crime. In all of them the, opinions to which the funds had been diverted were unknown in the denomination to which the donor belonged, and in some of them it was made to appear that the words of the instruments had, in the established usage of the sects to which the donors belonged, a peculiar and conventional sense, that limited their general meaning.

To attempt a full statement and analysis of these cases would be quite too tedious. I will, however, refer to some of them.

In the *Attorney-General* v. *Pearson*, 3 Merivale 353, a congregation of dissenters, holding Trinitarian opinions, erected a meeting-house under a trust deed, dated in 1701, declaring that the house should be for the worship of Almighty God. The congregation and the ministers were Trinitarian for about one hundred years, when a Unitarian minister was settled and preached. The court decided that this was a diversion of the house from the legal use, and admitted in evidence; and reasoned on the fact, that the founders were a congregation of Trinitarians, and held, that inasmuch as it could not be discovered from the deed what the religious worship intended was, it must be inferred from the opinions and usage of the congregation; that as Unitarian doctrines were unlawful, and Unitarians unknown as a sect in England at the time when the deed was made, it must be inferred that they were

intended to be excluded, though, by change in the laws, Unitarian opinions were not illegal at the time of the hearing. In that case the court, it will be observed, went, partly at least, on the ground that, on account of the looseness and generality of the language used in the deed, the intentions of the donor could not be ascertained from the deed itself without the aid of extrinsic evidence. That reason for admitting the evidence is not found in the present case ; and I do not understand that such a reason can be admitted in any case, to warrant the introduction of parol evidence ; for, if the difficulty appears on the face of the instrument, and the court cannot gather the intention from the writing merely because it is worded too loosely and obscurely to show what the writer meant, he has failed to express his intention, and the writing, as I understand the law, must be held void for uncertainty. There is no such difficulty here. The terms of Mr. Sprague's will we find intelligible in themselves, and sufficiently specific to show how he intended his charity should be applied. Then, again, the main ground upon which the *Attorney-General* v. *Pearson* was decided is wanting in the present case ; for Unitarians were a well known sect in the country, and their opinions not unlawful when this will was made. The *Attorney-General* v. *Pearson* was heard before Lord *Eldon*, in 1817, on an application for an injunction.

In *Shore* v. *Wilson*, 7 Sim. 290, (note,) which was the celebrated case of *Lady Hewley's Charities*, a fund had been given, in 1707, to aid "Poor and Godly Preachers of Christ's Holy Gospel," which, after being long appropriated to the benefit of Trinitarians only, was at length partly applied by the trustees to aid Unitarians. The cause was first heard before the vice-chancellor, Sir *J. L. Knight Bruce*, who admitted evidence of the opinions of Lady Hewley, the foundress, and also of her husband, and of Dr. Colton, one of the original trustees. The vice-chan-

cellor said, " I am quite certain Lady Hewley would never have considered the disseminators of this book" (The Improved Version of the Scriptures) " as disseminators of Christ's Holy Gospel. Therefore my decree must in substance declare that no persons who deny the divinity of our Saviour's person, or who deny the doctrine of original sin, as it is generally understood, are entitled to participate in Lady Hewley's charity." The decree would seem to have gone, in part at least, upon what were proved to have been Lady Hewley's individual views · on religious subjects. The cause was next heard before Lord *Brougham*, Chancellor, but no decree was made while he remained in office ; and afterwards before Lord *Lyndhurst*, who asked the assistance of Justices *Patteson* and *Alderson*. They say, in their opinion, if the intention of the founder is clearly expressed in the instrument, there can be no difficulty ; if expressed in doubtful or general words, recourse must be had to extrinsic circumstances, such as the known opinions of the founder, the existing state of the law, the contemporaneous usage, and the like. Lord *Lyndhurst* followed this opinion, and received and considered evidence that Lady Hewley was a Presbyterian, and of the opinions held by Presbyterians when the deed was made. But he relied, and it would seem chiefly, on the other ground that Unitarians were not known as a sect, and that their opinions were unlawful in Lady Hewley's time. He also assumed that the words of the deed were so general and loose that the court could not execute the trust without some limitation of their meaning, as they stood on the face of the instrument. He says, " It may be said that the term, *Poor and Godly Preachers*, is clear and precise ; but it is admitted on all sides that it does not include ministers of the Established Church. It appears, therefore, that the terms, *Poor and Godly Preachers*, are to be taken with some limitation, and the question therefore is, what are the proper limitations and restrictions in this instance."

It is a settled rule in England that the courts will apply every fund given for the support of religion to the Established Church, unless the donor had directed otherwise.

If the donor's opinions had not been admitted in the case of which we have been speaking, this rule might have taken the fund from the religious denomination to which the founder belonged, and given it all to the church. And it is not unlikely that the courts may have been unconsciously influenced, in admitting the evidence, by a desire to avoid the injustice of giving a practical operation to that rule in these instances.

This case of Lady Hewley's charities went to the House of Lords, 9 Cl. & Fin. 499, and seven of the common law judges attended there, and gave each an elaborate opinion. There is a good deal of diversity in their views on different points, but they all, except perhaps Mr. Justice *Williams*, agree, as I understand them, that the individual religious opinions of Lady Hewley could not be received to aid in the construction of the language which she used in her deed. Even Mr. Justice *Williams* puts his opinion on peculiar grounds, which have no existence in the present case. He says, " If the terms are clear, plain and unambiguous, they must be explained by themselves. On the other hand, if the terms of the deed are in themselves obscure, indefinite and ambiguous, or become so in the application of them, it is necessary to call in aid extrinsic evidence to arrive at the intent of the founder; and in my humble judgment the deed in question is of that description. The very generality of the language in this case creates the embarrassment and the necessity of limitation. What is there to prevent an ample selection being made, (then or now) from members of the church of England, fulfilling in every particular the prescribed requisites ? Why not from among priests of the Roman Catholic persuasion ? I arrive at the conclusion that these words cannot be construed in all their generality, but must be

restricted, to some extent. Consistently with the view upon which I consider any of the evidence admissible, I am not aware of any which ought to be rejected."

Mr. Justice *Maule* held all the evidence to be inadmissible, and that Unitarians were entitled. The other judges thought it was competent to show, not Lady Hewley's individual opinions, but that she belonged to a religious party that used the words in a peculiar sense, different from their common meaning.

*Tindal,* C. J., said, " Where the words of a written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper application of those words to claimants under the instrument, or the subject matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves ; and in such case all evidence dehors the instrument, for the purpose of explaining it according to the surmised or alleged intention of the parties, is wholly inadmissible. But in mercantile contracts, which in many instances use a peculiar language, employed by those only who are conversant in trade and commerce, and where the words, besides their common meaning, have acquired, by custom or otherwise, a well known peculiar idiomatic meaning in the particular country in which the party using them was dwelling, or in the particular society of which he formed a member, and in which he passed his life, evidence may be received to show the peculiar sense in which the words were used." " But the evidence is to be strictly limited to cases of the description above described, and to evidence of the nature above detailed, and in no case is it permitted to explain the language of a deed by evidence of the private views or the secret intentions of the party to the instrument, whether political or otherwise, any more than by express parol declarations made by the party himself."

All the seven judges, except *Maule*, held Unitarians to be excluded, chiefly, as it would seem, because Unitarians were an unknown sect in England, and their opinions unlawful when the charities were founded; and the lords affirmed the chancellor's decree without assigning the particular grounds of their decision.

The *Attorney-General* v. *Drummond* originated in Ireland, and was heard there before *Sugden*, Ch., 1 Drury & Warren 368, and 1 Connor & Lawson 210. The questions were on the construction of a deed of trust, made in 1710 by certain Presbyterians, giving a fund "for assisting Protestant and dissenting congregations that are poor and unable to provide for their ministers." The chancellor held that the religious opinions of the founders were not admissible to determine whether Unitarians were entitled to share in the benefits of the charity. He said, "The court, in construing two deeds in the same terms, if such evidence were admitted, would be compelled to give different constructions to the deeds. This shows the difficulty of admitting evidence of mere opinions as a foundation for the construction of particular expressions in a deed; but we must not put a construction on the words of the founders contrary to the general meaning of the words, because they embraced a particular set of opinions. I shall throw out of the consideration of this case all evidence of mere opinions of the founders." He held Unitarians to be excluded on the other ground that there was no such sect in the country, and their opinions were unlawful at the time when the deed was made.

When this case of the *Attorney* v. *Drummond* was before the House of Lords, where the Irish chancellor's decree was affirmed in 1849, Lord *Campbell* expressed his opinion that some of the evidence received and reasoned on in Lady Hewley's case was clearly inadmissible. He said: "In construing such an instrument you may look to the usage, to see in what sense the words were used at that

time of day. You may look to contemporaneous documents, to see in what sense the words were used in the generation in which the deeds were executed, but to admit evidence to show in what sense they were used by particular individuals is contrary to sound principles." 1 House of Lords' Cases 837.

As I understand the facts of these cases, and the grounds on which, in some of them, evidence was received of the opinions entertained by the founders of those charities, no one of them can be regarded as an authority for the admission, in the present case, of evidence to the opinions held by Mr. Sprague; and the weight of judicial opinion in England appears now to be against the correctness of the decisions by which such evidence was formerly admitted.

There have been some cases in this country which may be thought to bear on the question.

In *Miller* v. *Gable*, 10 Paige 627, and 2 Denio 493, land was conveyed, in 1765, to trustees for the use of a church known as the German Reformed Church in the city of New-York, which was then Calvinistic in doctrine, and was called in the declaration of trust, "The Calvinistic Church in the city of New-York, worshipping in the German tongue." It was held by the chancellor, contrary to the learned and elaborate opinion of *Hoffman*, vice-chancellor, that the trust so created was limited to the exclusive use of a congregation holding Calvinistic doctrines. But the chancellor's decree was reversed on appeal, by a vote of 14 to 3. That case was widely different from the present in the main facts, and I do not see that any point decided in it can be regarded as an authority on the particular question which we are now considering. Indeed, I do not find anything in the case respecting the opinions of the founders, except what may be inferred from the fact that they made the gift to a church known and described as Calvinistic. Neither the chancellor nor vice-chancellor discuss

the question whether the individual opinions of the founders could be received as evidence; and that question does not appear to have been raised on the facts of the case; the question being, as stated by Porter, one of the three senators who were for affirming the chancellor's decree, "whether property, originally given by the founders of a church for the use of that particular church, shall forever thereafter be devoted to the teaching of the peculiar religious doctrines and tenets, and subjected to the particular form of church government which was established in the church by its original patrons and founders."

In *Kniskern* v. *The Lutheran Churches of St. John's and St. Peter's,* 1 Sandford Ch. 439, it was held by *Sandford,* assistant vice-chancellor, in 1844, that, "where a trust is created for the use of a congregation of Christians, designating such congregation by the name of a sect or denomination, without any other specification of the worship intended, the intent of the donors or founders in that respect may be implied from their own religious tenets, from the prior and contemporaneous usage, tenets and doctrines of the sect or denomination to which such congregation belongs." This case may be considered as an authority that the opinions of the donor, with other evidence, may be received to show what religious doctrines were intended to be supported; and it is the only case in this country that I have met with, going to that point.

There are great practical difficulties in the way of admitting such evidence. In the first place, the court must settle, as matter of fact, what were the religious opinions of the founder; an undertaking of no little difficulty, where the denomination to which he belonged has no creed, or admitted common confession of faith, and where there are no written articles of belief, to which it is agreed that he assented, nor any published and avowed statement of his opinions in existence, especially when the inquiry is instituted forty years after his death. Then, again, what effect

is to be given to the evidence, when admitted? It certainly cannot follow in all cases, as a legal conclusion, that the donor intended to limit his gift to the support of his own religious opinions and no others; as, for instance, where in express terms he gives the fund to support other and different doctrines. Nor could it be contended, if he gave his charity to maintain religion in a church or congregation that he knew to be established in opinions different from those which he entertained himself, that he meant to require the donees to apostatize from their faith, and adopt his own before they could enjoy his bounty. If the donor, being a Unitarian, should give a fund, and in the deed or will should say expressly that it was for the support of Trinitarian opinions; or should give it, say, to the "Trinitarian Congregational Society in Dublin," which he knew to hold Trinitarian doctrines, I suppose it would not be maintained that the fund must be applied to the support of Unitarian opinions only, because the donor was himself a Unitarian.

At most, such evidence is but one circumstance, which the court are to weigh with or against other circumstances, and draw the conclusion of fact on a balance of the evidence. And in such case the inference as to the donor's intention is drawn as matter of fact from the extrinsic evidence; is shown and proved by the extrinsic evidence, and not deduced, by legal construction, from the written instrument which creates the trust. This is nothing else than allowing parol evidence to show an intention different from that which the legal construction annexes to the words chosen by the donor to express his intention in the written instrument, and appears to be in palpable conflict with the rule which excludes parol evidence to vary or control a written instrument.

Then, again, in the present case, how far and to what extent are we to presume that Mr. Sprague intended to insist on his own religious opinions? It certainly could

not be supposed, unless he expressly said so, that he intended to require his successor in the Congregational society to hold exactly the same religious opinions on all religious questions that he held himself. No such man could probably be found in the Congregational denomination. If it should be said that conformity could be expected only in matters which were substantial and essential, then comes the inquiry; what religious doctrines are to be regarded as substantial and essential? The court, it is clear, could not determine what doctrines are really and intrinsically so. They could only endeavor to learn what were considered as such by the donor himself. The object being to ascertain the actual intention of the donor, the inquiry would be as to his individual views on this point. It is said that the doctrine of the Trinity is regarded on all hands as essential. Granting that to be so, it does not follow that other doctrines were not considered by the donor as equally important. Looking to the evidence, we should conclude that Mr. Sprague was very strenuously opposed to the doctrine of election and predestination, as set forth in the Catechism; that he looked upon this question of free will and predestination as substantial and essential, and would be as likely to insist that his own opinions on that subject should be followed as any other; and, taking the ground that no one could receive any benefit from this fund who did not agree with the donor in religious doctrines which he regarded as substantial and essential, Mr. Abbot, the complainant, if he holds to all the doctrines of the Catechism, would be excluded on that account.

If it should be said that there are two well known divisions, Orthodox and Unitarian, in the Congregational ranks, and it could be shown to which of these divisions the testator belonged, it might be answered, that unless the donor classed himself publicly with one or the other of those divisions, it does not appear to us by any means

an easy undertaking so to draw the line between them that it will in all cases be seen at once on which side of it a man could fall. So far as we have any information, from common observation and reading, or from our investigation of this cause, we find in the religious division called orthodox, or evangelical, no small diversity of opinion on points which have heretofore been considered, and by some are still considered, as substantial and essential. And, on the other hand, the opinions of those who are classed under the general name of Unitarians, commencing with such as are not readily distinguished from those held by some who are recognized as Orthodox, are shaded down to a point, where it is charged upon them that there is little left but mere natural religion.

Besides, if evidence of the donor's opinions were received and weighed, it would be by no means conclusive to show that he must have intended the fund should be devoted to support his own opinions only, even in matters that he regarded as material and substantial. It does not appear to me impossible, nor by any means extraordinary, that a man should give a charitable fund to aid a particular religious society in maintaining religion, without meaning to insist on his own religious views, and with liberty to choose and change their religious opinions, within limits as large as the utmost boundaries of the Congregational denomination. Men are perhaps to be found who are entirely confident that their own religious views are in all respects correct, and that those who differ from them are certainly in the wrong; while others, like John Robinson, regard religious truth as progressive, and are waiting for new light to break forth from the Scriptures. Men of this last class would not be likely to insist on binding the society which they endowed, to hold, for all future time, the same religious opinions which they entertained themselves. We may suppose, too, that, with some liberal minded and public spirited men, the main object

of their bounty would be to relieve a society with which they had been long connected, and to which they were much attached, from the burden of maintaining religious worship, rather than to inculcate and perpetuate any particular system of doctrines.

There is another view of this question which is worthy of consideration ; a view suggested by Mr. Justice *Maule* in the case of Lady Hewley's Charities. Suppose that Mr. Sprague wished and intended that his own religious opinions should be maintained and taught in the society ; might he not well say, " I know the Congregational society in Dublin, and can safely trust them with the choice of their own Congregational minister. I am well acquainted with their religious views ; I have taught them religion for forty years. I think it best and safest to repose in them and their successors the trust of continuing and perpetuating my religious opinions ; and I will not attempt to set forth and prescribe any set of doctrines which the minister of their choice must hold, in order that they may have the benefit of my charity. I will not send my townsmen, if any difference of opinion should spring up among them after my decease, to wrangle in courts of law upon the meaning of theological terms used in my will ; the society may hold any doctrines that are admitted within the Congregational denomination."

It sometimes happens that in the application of general rules we cannot but feel that injustice has been done in the particular case. This must always be matter of regret, though the paramount importance of adhering faithfully to general principles in the administration of the law forbids that courts should yield to any such feeling. We are happy, in the present case, to be free from any apprehension that the rule which we feel bound to declare, excluding evidence of the donor's individual opinions, has defeated his real intentions, and shut out the merits of the cause from our consideration ; for we have examined

the evidence offered on this point, and are satisfied that if received it could, not have brought us to a different conclusion.

Mr. Sprague made his will on the 13th of December, 1817, and died on the 17th of the same month, of an accidental injury received on the 11th. He was minister of the town and of the Congregational church and society from the 12th of November, 1777, till his death, and appears to have performed the duties of his office during all that time. There does not appear to have been any other preacher in the society or town while he lived; and there is direct evidence that he was preaching there in the autumn of 1817. He was in an Orthodox neighborhood, and surrounded by Orthodox clergymen; so that there is no ground to suppose that his flock derived their religious views from any other source than his own teaching. In September, 1820, Mr. Leonard was settled as his immediate successor, and the income of the fund has been paid to him and his colleague since that time. Mr. Leonard held, at the time of his settlement, the same opinions that he holds now, and substantially the same with those of Mr. Bridge. The case affords no ground for the position that Mr. Leonard's opinions were not as well known when he was settled as they ever have been at any time since. It is quite impossible to believe that any intelligent person in Dublin could have been ignorant that he was a Unitarian. Yet the people who had been sitting for forty years under the religious teaching of Mr. Sprague, within less than three years after his death settled as his successor a clergyman whom they must have well known to be a decided and an avowed Unitarian, without, so far as appears, any dissent or objection from any member of the church or congregation; and I recollect no evidence that any objection to the doctrines held and preached by Mr. Leonard was expressed by any member of the church or society for seven years after his ordination.

On this state of the case we must draw the conclusion that at the time when Mr. Sprague made his will, his church and society were not orthodox and Trinitarian in their religious opinions. To presume, in the absence of all evidence to explain a thing so extraordinary, that in two or three years' time they had gone over in a body to the Unitarian party, and abandoned a faith supposed to be essentially and radically different, and in which they had been indoctrinated for forty years, would be altogether unreasonable and extravagant; for the religious faith of a church and society, in a country place like Dublin, is a thing of slow growth, and, in ordinary circumstances, a change of opinion so unanimous and so sudden would be contrary to all common experience; and certainly it would not be contended that Mr. Sprague could be ignorant of the religious opinions entertained by his own church and society. We think the fact is well established in the case, that when Mr. Sprague made this gift for the benefit of his own church and society, their opinions were not Trinitarian and orthodox, and that this fact must have been well known to him at the time.

Suppose, then, for the present, that Mr. Sprague's opinions were proved to have been orthodox; if, nevertheless, he gave the fund for the benefit of a church and society that he well knew were not orthodox, are we to infer that he meant to require the church and society to apostatize from their own faith, and adopt his religious views, before they could enjoy the fund which he had given for their use? If he intended to set any such extraordinary limitation on his bounty, we should certainly expect him to have said so in express and explicit terms. The authorities which admit extrinsic evidence to limit the meaning of general words used in an instrument establishing a religious charity, lay down the rule that when a fund is given to a denomination or society of known religious opinions, it must be inferred that the intention was to support the

religious opinions of that denomination or society, and that it would be a misapplication to appropriate the funds for the support of different opinions. *Miller* v. *Gable; Kniskern* v. *The Churches of St. John and St. Peter, qua supra.* If Mr. Sprague's opinions were shown to have been Trinitarian and orthodox, that evidence would yield, as I think, to the other fact, that he gave the fund for the benefit of a church and society that he knew were not orthodox and Trinitarian.

Upon the question of fact, whether Mr. Sprague held opinions at such variance with those of Mr. Leonard and Mr. Bridge as would raise a presumption that he intended to exclude them from the benefits of his charity, there are some general views which I think must have a controlling weight. Mr. Sprague had been the religious teacher of the church and society for forty years. In all that time there does not appear to have been the smallest difference or dissatisfaction between them on any subject. If he was decided and strenuous for any particular system of religious doctrines, it is not in the nature of things to suppose that his people, at the end of his long ministry, would have been found in a body, and without dissent, entertaining opinions substantially and essentially different from his own. It would be a bold position to take in argument, that a clergyman could be so decided and zealous for a system of religious opinions as to make it a condition, in the appropriation of a public charity, that it should be exclusively applied to the support of those opinions, and yet that his own church and congregation should have imbibed, under so long a course of his teaching, doctrines regarded as opposite and antagonistical to those which he held himself. The most direct and convincing evidence would be required to establish a fact so improbable. The fact, however, is, we think, very apparent in this case, that Mr. Sprague at his death left his flock Unitarian, certainly not Trinitarian and orthodox.

The Dublin Case.

Then, again, the original and continued appropriation of the fund by the town to the support of the same religious opinions that are now held by Mr. Leonard and Mr. Bridge, without objection for thirty-five years, has an important bearing, not only on the construction of doubtful terms used in the will, as has been before remarked, but on every question of fact affecting the right to the fund, that may be raised at this distance of time. The people of Dublin must have known then, better than it would be possible for us to learn now, what were the religious opinions of Mr. Sprague. If they were orthodox and Trinitarian—such as would show his intention that his charity should go for the support of those opinions only— these trustees must have known it; and we are not to presume that they would violate the trust so recently reposed in them, by applying the fund to the support of different opinions ; nor that such a misapplication would be so long acquiesced in by those who were interested in the subject. If Mr. Sprague's opinions were so different from those of his successors that he could not have intended his charity should be applied to their support, how did it happen that this misapplication was originally made by trustees, who must have been well acquainted with his views and opinions, and who were selected by him as most likely to carry his intentions faithfully into effect ? and why was the misapplication so long continued and submitted to ?

The direct evidence offered to prove Mr. Sprague's religious opinions is contradictory, and such as, at this distance of time, is by no means satisfactory. Without going into an extended examination, it may be remarked that no published writing of his, nor any admitted creed or confession of faith, is produced to show his opinions. We have certain documents said to be manuscripts of sermons in his hand-writing, which, if not absolutely illegible, are certainly extremely difficult to read. There is no

evidence of the time when they were preached, nor any direct evidence that they were ever preached at all; but the evidence is sufficient to satisfy us that they are in his hand-writing. They must be supposed to express his real sentiments at the time when they were written, and may fairly be presumed to have been preached by him at some time during his ministry. Taking this for granted, and that the counsel have been able to decypher correctly the parts to which our attention has been directed, all that we have been able to consider is certain detached passages from these discourses, some of which undoubtedly contain orthodox sentiments, stated in sufficiently strong general terms. But we find in no one of them any thing like an argumentative and theological exposition of the writer's religious opinions. They are for the most part in a pathetic and rather declamatory strain, in no instance purporting to be a definition or guarded statement of his doctrinal views. And as we are wholly without evidence of the time when these discourses were preached or written, they are far from being sufficient to satisfy my mind that the prevailing tone and scope of his religious instructions continued till the end of his life to be of a character substantially different from the opinions which his flock imbibed under his preaching.

In the other evidence relating to the opinions of Mr. Sprague, there is that sort of conflict which we should expect to find when witnesses are called on to give their recollection of conversations and circumstances, after the lapse of more than forty years. On the whole, the evidence, when brought into contradiction with the presumptions arising from other parts of the case, entirely fails to satisfy us that Mr. Sprague when he made his will held opinions so substantially and essentially different from those of Mr. Leonard and Mr. Bridge, that any inference can thence be safely drawn of an intention to exclude opinions like their's from the benefits of his charity.

So far as we have the means of forming a judgment from the evidence before us, we should be inclined to think that Mr. Sprague was not a man whose mind was much trained in theological discussions. The deciphered passages from his sermons are mostly mere specimens of religious exhortation. Nothing in the case tends to show that he was devoted to the study of polemical divinity, or was inclined to nice distinctions in matters of doctrine. We should infer that he was of a social, benevolent and generous disposition; by no means ascetic in his tastes and habits; that, if he was capable of apprehending nice theological distinctions, he would not be likely to insist on them so strenuously as some other more earnest men. He was a graduate from Harvard College, of the year 1770; the president of that college preached his ordination sermon; he was a native of Boston, or that neighborhood, where his father resided, from whom it is understood that he derived his estate; his religious and social relations are likely to have been kept up with Cambridge and that part of the country; and it is by no means improbable that his religious views may have undergone material changes in the course of his long ministry, as happened to many other clergymen in the time when he lived. Nothing that we have been able to learn of his opinions, his character, his habits, or of the relations which he maintained with his townsmen and parishioners, would incline us to believe that, in leaving a fund to aid them in supporting religion, he would be likely to insist on binding them strictly to any narrow and sharply defined system of doctrines.

Another position taken by the complainants is, that the religion professed by Mr. Leonard and Mr. Bridge is not the Christian religion; within the meaning of the term as used in the will. I have not the smallest hesitation in saying that this position cannot be maintained. They believe that the Scriptures contain a divine revelation,

---
The Dublin Case.
---

given by inspiration of God, and the only sufficient rule of faith and practice ; in the divine mission and the divine nature of Jesus Christ ; in his resurrection from the dead ; in the personality of the Holy Ghost. They acknowledge Jesus Christ as their Lord and Master, and as the great head of the church, and claim the character and name of Christians.

Some zealous divines, holding that the doctrine of the Trinity is an essential part of the Christian religion, have thence drawn the conclusion, as a logical inference, that Unitarians were not Christians ; but no one, so far as I have seen, has denied that they were in possession of the name of Christians, or that Unitarians, holding opinions like those of Mr. Leonard and Mr. Bridge, when the Christian religion was mentioned in general terms were not included as one of the numerous sects and divisions that pass under the general description of Christians. The same men who insist that Unitarians usurp the name of Christians, and are not entitled to it, when they use the term Christian religion in a general sense, include Unitarians under that name. Thus Dr. Emmons, in the same discourse in which he maintains that Unitarians are not entitled to the name of Christians, because the Trinity is an essential doctrine of Christianity, says, "Though *all denominations of Christians* profess to believe that there is one only living and true God, yet they" (that is, all denominations of Christians) "do not all profess to believe that he exists a trinity in unity."

In the *Attorney-General* v. *Drummond*, Lord *Campbell* said : "Though, when Unitarians were proscribed by law, they could not be regarded as Christians, yet in the reign of Queen Victoria it would be very unchristian to deny them the name of Christians." In *Shore* v. *Wilson, Coleridge*, J., says, "Unitarians profess to be Christians as much, and, we doubt not, as sincerely as Trinitarians, and I apprehend there is nothing unlawful at common law in

The Dublin Case.

reverently doubting or denying doctrines parcel of Christianity, however fundamental;" and his opinion was that in the actual state of the law Unitarians would be entitled as godly preachers of Christ's holy gospel.

Protestants, I take it, are one division of the Christian religion, and all who are of the Protestant religion are of the Christian religion. Under our constitution none but Protestants can hold certain offices. So the acts of 1819 and 1827 authorized "members of any sect or denomination of Christians" to form religious societies. Unless Unitarians are to be reckoned as of the Christian religion, no Unitarian is eligible to the office of governor, senator or representative, and Unitarians cannot form a religious society under the statute. It is quite clear that, under the constitution and laws of this State, Unitarians have always been regarded as a sect and division of the Christian religion, and we have no difficulty in holding that they must be so regarded, within the meaning of the term as used in this will.

Some minor points remain to be disposed of.

It is objected that Mr. Bridge was not regularly ordained, because a council was not called of the neighboring ministers and churches. Such, it is said, is the usage, and that it ought to be maintained, to prevent a troublesome neighbor from being intruded, and to maintain the faith and order of the churches. We think there can be no such rule of universal application in the denomination. It would be inconsistent with recognized Congregational principles that a combination of neighboring ministers and churches should have power, after a clergyman was chosen by a church and congregation, to shut him out, on the ground that he would be a troublesome neighbor, or was impure in doctrine. It is said that Mr. Bridge could not have been ordained in this regular way, because the neighboring ministers and churches were opposed to him in religious opinion. The consequence of enforcing such

a rule would be that no Unitarian could be settled in an Orthodox neighborhood, nor any Orthodox clergyman in a Unitarian neighborhood; nor could any Congregational minister be settled in any neighborhood where that denomination was not already established. The ordaining council is no doubt in most instances composed of members who come chiefly from churches in the neighborhood, because that is usually most convenient. But I do not understand that there is any rule or practice of the denomination which, under all circumstances, requires it. Only two clergymen of the council called to ordain Mr. Sprague were, as I understand, of New-Hampshire—the others were from Massachusetts; and in the case of Mr. Dunbar, of Peterborough, eleven of the clergymen who were called to the ordaining council were of Massachusetts.

The fund is given to support the Christian religion in the *Congregational Society in Dublin*, and the interest of the fund is required to be paid to the minister who shall statedly preach in *said society*. The intention is very plainly expressed to limit the benefits of the fund to the Congregational Society of which Mr. Sprague had been the minister, and the payment of the income to the minister of that society; and unless the First Congregational Society is to be regarded for this purpose as the same with the Congregational Society, the minister is not qualified, under the will, to receive the income of the fund.

The Congregational Society was a voluntary association, from which the members might secede at pleasure, and to which, in order to perpetuate the society, new members would of course from time to time be added; and the society was associated with an organized church. If part of the members should secede, and new members be added, the society would still remain the same association. The members of the society, or the great body of them, adopted the law of 1819, and continued the association under that law, remaining connected with the same church.

Mr. Fisk recollects no single member of the old society who survived to the time when Mr. Leonard was settled, and did not attend his meeting; and for years afterwards there was no other Congregational society in the town. The society associated under the statute was still a voluntary association, from which members might at any time retire, and to which new members would be added; it was connected with the same church, and the general object was the same as that of the old society. Previous to 1819 towns had power to make contracts for the support of religious worship, and to assess taxes for that purpose. By the statute passed in that year the law in this respect was changed, and to accomplish the object which had been before reached by the connection of unincorporated voluntary associations with towns, it became extremely convenient, if not absolutely necessary, for religious societies to bring themselves under the operation of the new law, that they might be able to hold property and make contracts for the support of religion.

By the new arrangement which the Congregational Society made under the statute, the character of the society, for all purposes relating to the enjoyment of this fund, was not materially changed. It was still a voluntary society, with precisely the same general objects. The members were no more changed, and no more liable to future change, than they would have been under the old organization; and they remained connected with the same church. The voluntary society therefore became a corporation under the statute; and where a fund is given to a voluntary society, which is afterwards incorporated, the fund vests in the corporation; so if a fund is given in trust for a voluntary society, afterwards incorporated, the fund will be held in trust for the corporation. *Kniskern* v. *The Lutheran Churches, &c.*, 1 Sandf. Ch. 439; *So. Baptist Ch.* v. *Yates*, 1 Hoff. Ch. 142; *Presbyterian Ch.* v. *Executor of Dannon*, 1 Dessau. 154. We think that the First

Congregational Society is to be regarded as the same with the Congregational Society, for the purpose of taking the benefit of this fund, and that the minister of the First Congregational Society, being otherwise qualified, is entitled to receive the interest.

The right, then, to the benefit of this fund vested in the First Congregational Society, when they had a regularly ordained minister of the Congregational persuasion, statedly preaching in the society; and we are of opinion that seceders from the society and new Congregational societies have no claim to share in the income. The intention is too clearly expressed for reasonable doubt that the whole income of the fund should be paid to the donor's successor in the Congregational Society. Such is the plain import of the language used. Nothing in the will or in the circumstances of the case affords the smallest countenance to the notion that the testator meant to encourage division and dissension among his people, by giving part of his charity to seceders. The fund is not given to support the Congregational religion in Dublin, or for the benefit of the Congregationalists of Dublin; but the income, and the whole income, is required to be paid to the minister of the Congregational Society. The case shows, according to the opinion which we have expressed, that Mr. Bridge is the minister within the meaning of the will, and the income of the fund, by the express terms of the will, is to be paid to him. This is widely different from the case cited of a charity for the benefit of the "Jews' Poor at Mile End." If this fund had been given for the benefit of the Congregationalists of Dublin, that case would have been more in point. When part of a religious association separate and establish a new society, they cease to be members of the original society, and have no longer any claim to their property. *Reformed Church* v. *Princeton Seminary*, 3 Green's Ch. 77; *Presbyterian Ch.* v. *Dannon*, 1 Dessau. 154; *Baptist Ch.* v. *Witherell*, 3 Paige 296.

We are asked to remove the town of Dublin from this trust, and appoint new trustees, because, it is said, since the law of 1819, towns have no interest in the maintenance of religion, and therefore have no legal capacity to hold a fund in trust for a religious use. But there is no difficulty in compelling towns to execute such a trust; and towns have a general interest that religious institutions should be maintained for the benefit of the inhabitants. They were endowed, at least many of them, in the original grants of their corporate powers, with lands to aid in the support of religion. The power to make contracts and raise taxes for that object has been taken away; but we see no reason to believe that it was intended to deprive them of the power to hold funds in trust, to aid in supporting religion within their limits, whether the funds had been entrusted to them at the time when the act was passed or have been given since. There would be great inconvenience in denying them this power. It is believed that the instances are very numerous in this State where funds are held in trust by towns to assist the inhabitants in maintaining religious institutions. To what other trustees could the court transfer the trust, where the funds could be held more conveniently or more safely? Though not directly within the scope of the more appropriate duties and powers of towns, it certainly is not repugnant to the general object of such corporations, nor inconsistent with that object, to hold funds in trust for the support of religion in the towns. It was said by *Story*, J., in *Vidal* v. *The Mayor, &c., of Philadelphia*, 2 Howard 128, that there was " no positive objection in point of law to a corporation taking property upon a trust not strictly within the scope of its institution, but collateral to it; nay, for the benefit of a stranger, or another corporation." Towns in this State are to be regarded as a coördinate branch of the government, established to advance the general good of the people; and under our constitution no one can entertain a doubt that to maintain

the institutions of religion is an object quite consistent with the general purpose for which towns are created, and that towns have at least an indirect interest in promoting religion within their limits.

We are of opinion that the complainants have not made out a case which calls on the court to interfere with the application hitherto made by the trustees of this charitable fund; and the conclusion is that the bill and information must be                                                           *Dismissed.*